PEOPLE v HIGUERA

Docket No. 213557. Submitted June 9, 1999, at Detroit. Decided January 30, 2001, at 9:00 A.M.

The Wayne Circuit Court, Jeffrey G. Collins, J., entered an order affirming the district court's dismissal of charges against Doctor Jose Gilberto Higuera of violating the criminal abortion statute, MCL 750.14; MSA 28.204. Both courts determined that the statute is unconstitutionally vague. The people appealed by leave granted.

The Court of Appeals *held*:

1. The statute must be read in light of the decision in *People v Bricker*, 389 Mich 524 (1973), which construed the statute to conform to the dictates of *Roe v Wade*, 410 US 113 (1973), and *Doe v Bolton*, 410 US 179 (1973). *Bricker* stated that the statute, which prohibits all abortions except those required to preserve the life of the mother, does not apply to "miscarriages" authorized by a pregnant woman's attending physician in the exercise of his medical judgment, that the effectuation of the decision to abort is also left to the physician's judgment, but, however, a physician may not cause a miscarriage after viability except where necessary, in the physician's medical judgment, to preserve the life or health of the mother.

2. The statute was not impliedly repealed by the Legislature's post-*Bricker* enactment of legislation that regulated, rather than prohibited, abortions. The Legislature intended to regulate those abortions permitted by *Roe* and *Doe*, and *Bricker*, and did not intend to repeal the general prohibition of abortions to the extent permitted by the federal constitution, as construed by the United States Supreme Court.

3. The *Bricker* Court's discussion of the constitutionality of the statute was not dictum and does have binding effect.

4. The statute, as construed in *Bricker*, clearly reaches the conduct that the prosecution contends is involved in this criminal matter.

5. The factual allegations in the complaint were sufficient to adequately inform of the substance of the accusations and provide a basis from which the commission of the legal elements of the charge can be inferred. Any deficiencies, such as the failure to spe-

cifically allege that the defendant believed that the fetus was viable and did not believe that the procedure was necessary to preserve the health of the mother, can be cured by amendment.

6. The statute, as interpreted in *Bricker*, contemplates deference to the subjective good-faith medical judgment of the physician. Here, the information must allege, and, to convict, the prosecution must prove, that the fetus was twenty-eight weeks old and viable, that the defendant himself subjectively believed that the fetus was twenty-eight weeks old and viable, and that the defendant, in his own mind, did not hold the subjective belief or medical judgment that the procedure was necessary to preserve the life or health of the mother. The order of dismissal must be reversed and the matter must be remanded for reinstatement of the charge and further proceedings.

Reversed and remanded.

JANSEN, J., dissenting in part, stated that the statute is unconstitutionally vague. *Roe* and *Bricker* and subsequent United States Supreme Court cases establish a proscription of abortions at the stage of viability (with the exception of endangerment to the life or health of the mother), not at the beginning of the third trimester or after passage of a certain number of gestational weeks. There was no allegation in the complaint that the defendant aborted a post-viable, healthy fetus or that the abortion was not necessary to protect the life or health of the mother. The statute should be found to be unconstitutionally vague as applied to the defendant's alleged conduct because the complaint does not allege that the fetus was viable in the judgment of the defendant (the attending physician) in light of the particular facts of the case before the defendant or that there was a reasonable likelihood of the sustained survival of the fetus outside the womb with or without life support. The deficiencies of the statute, even as interpreted by *Bricker*, are that it does not tie the determination of viability to the attending physician's exercise of medical judgment and it contains no scienter requirement regarding the determination of viability or the determination of medical necessity. The lower court's finding that the statute is unconstitutionally vague and the order dismissing the charge should be affirmed.

1. ABORTION AND BIRTH CONTROL — STATUTES — JUDICIAL CONSTRUCTION — CONSTITUTIONAL LAW — SUPREME COURT.

In *People v Bricker*, 389 Mich 524 (1973), the Supreme Court construed the statute that purports to criminalize all abortions performed during pregnancy, except when necessary to preserve the life of the mother, to conform with the dictates of the United States Supreme Court's decisions in *Roe v Wade*, 410 US 113 (1973), and

*Doe v Bolton*, 410 US 179 (1973), and the *Bricker* Court's construc-
tion has binding effect (MCL 750.14; MSA 28.204).

2. ABORTION AND BIRTH CONTROL — STATUTES — JUDICIAL CONSTRUCTION —
   REPEALS BY IMPLICATION.

The Legislature's enactment of statutes that regulate, rather than pro-
   hibit, abortions after the Michigan Supreme Court in *People v
   Bricker*, 389 Mich 524 (1973), construed MCL 750.14; MSA 28.204 to
   conform with the dictates of *Roe v Wade*, 410 US 113 (1973), and
   *Doe v Bolton*, 410 US 179 (1973), was intended to regulate those
   abortions permitted by *Roe*, *Doe*, and *Bricker*; the Legislature did
   not repeal the general prohibition of abortions in § 14 to the extent
   permitted by the federal constitution, as construed by the United
   States Supreme Court (MCL 333.2835, 333.17014-333.17016,
   333.17515, 333.17516, 333.20181-333.20184, 400.1 *et seq.*, 722.901 *et
   seq.*; MSA 14.15[2835], 14.15[17014]-14.15[17016], 14.15[17515],
   14.15[17516], 14.15[20181]-14.15[20184], 16.401 *et seq.*, 25.248[101] *et
   seq.*).

*Jennifer M. Granholm*, Attorney General, *Thomas
L. Casey*, Solicitor General, and *Mark E. Blumer*,
Assistant Attorney General, for the people.

*Smith Haughey Rice & Roegge* (by *Richard C.
Kraus*), and *Butzel Long* (by *Max R. Hoffman, Jr.*),
for the defendant.

Before: M. J. KELLY, P.J., and JANSEN and WHITE, JJ.

WHITE, J. The people appeal by leave granted the
circuit court's order affirming the district court's dis-
missal of the district court's charge against defendant
of violating the criminal abortion statute, MCL 750.14;
MSA 28.204. The district and circuit courts concluded
that the statute is unconstitutionally vague. We
reverse and remand for reinstatement of the charge
against defendant.

I

The statute, which on its face purports to criminalize all abortions performed at any time during pregnancy, except when necessary to preserve the life of the mother,[1] appears to be in direct contravention of *Roe v Wade*, 410 US 113; 93 S Ct 705; 35 L Ed 2d 147 (1973).[2] We cannot, however, evaluate the constitutionality of this statute on its face. Rather, we are obliged to read the statute in light of the decision of the Michigan Supreme Court in *People v Bricker*, 389

---

[1] MCL 750.14; MSA 28.204 provides:

Any person who shall wilfully administer to any pregnant woman any medicine, drug, substance or thing whatever, or shall employ any instrument or other means whatever, with intent thereby to procure the miscarriage of any such woman, unless the same shall have been necessary to preserve the life of such woman, shall be guilty of a felony, and in case the death of such pregnant woman be thereby produced, the offense shall be deemed manslaughter.

In any prosecution under this section, it shall not be necessary for the prosecution to prove that no such necessity existed.

[2] In 1973, the United States Supreme Court held in *Roe, supra*:

1. A state criminal abortion statute of the current Texas type, that excepts from criminality only a life-saving procedure on behalf of the mother, without regard to pregnancy stage and without recognition of the other interests involved, is violative of the Due Process Clause of the Fourteenth Amendment.

(a) For the stage prior to approximately the end of the first trimester, the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician.

(b) For the stage subsequent to approximately the end of the first trimester, the State, in promoting its interest in the health of the mother, may, if it chooses, regulate the abortion procedure in ways that are reasonably related to maternal health.

(c) For the stage subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother. [*Roe, supra* at 164-165.]

Mich 524; 208 NW2d 172 (1973). Nor are we presented with a broad challenge, in an action for declaratory relief, to the constitutionality of the statute. The question presented is, rather, whether a particular criminal prosecution under the statute would be constitutionally infirm. Under these circumstances, we are constrained to conclude that the circuit court erred in affirming the district court's dismissal of the charge.

II

Defendant, a medical doctor specializing in obstetrics and gynecology, was charged with violating the criminal abortion statute, MCL 750.14; MSA 28.204, for allegedly inducing the abortion of a fetus of approximately twenty-eight weeks, and altering a patient's medical records in violation of MCL 750.492a(1)(a); MSA 28.760(1)(1)(a). Defendant filed a motion to dismiss the charge that alleged violation of MCL 750.14; MSA 28.204, arguing that the statute is unconstitutionally vague, is unconstitutional on its face, and has been repealed by implication, and that the complaint is defective for failing to allege viability of the fetus or lack of necessity to preserve the health of the mother.

The district court determined that the complaint was not defective and that the statute was not unconstitutional on its face, but dismissed the charge on the ground that the statute had been repealed by implication and was void for vagueness. On the people's appeal, the circuit court concluded that the district court erred in finding that the statute had been repealed by implication, but agreed with the district court that the statute was void for vagueness. This

Court granted the people's application for leave to appeal.

III

Shortly after the United States Supreme Court decided *Roe, supra*, the Michigan Supreme Court, in *Bricker, supra*, addressed the constitutionality of the statute at issue in the instant case. Rather than declare the Michigan statute unconstitutional as irreconcilable with *Roe*, the *Bricker* Court construed this criminal abortion statute to conform to the dictates of *Roe* and *Doe v Bolton*, 410 US 179; 93 S Ct 739; 35 L Ed 2d 201 (1973). The Court said:

> Now that the United States Supreme Court has spoken concerning the constitutionality of state abortion laws, we seek to save what we can of the Michigan statutes.
>
> The central purpose of this legislation is clear enough— to prohibit all abortions except those required to preserve the health of the mother. The Supreme Court now requires other exceptions. They can properly be read into the statutes to preserve their constitutionality.
>
> *          *          *
>
> In light of the declared public policy of this state and the changed circumstances resulting from the Federal constitutional doctrine elucidated in *Roe* and *Doe*, we construe § 14 of the penal code to mean that the prohibition of this section shall not apply to "miscarriages" authorized by a pregnant woman's attending physician in the exercise of his medical judgment; the effectuation of the decision to abort is also left to the physician's judgment; however, a physician may not cause a miscarriage after viability except where necessary, in his medical judgment, to preserve the life or health of the mother.
>
> *          *          *

. . . We hold that, except as to those cases defined and exempted under *Roe v Wade* and *Doe v Bolton, supra,* criminal responsibility attaches. [*Bricker, supra* at 529-531.]

See also *Larkin v Wayne Prosecutor,* 389 Mich 533, 537; 208 NW2d 176 (1973), in which the Court stated that the constitutionality of MCL 750.14; MSA 28.204 "is discussed and decided in [*Bricker*], decided this day."

IV

Defendant argues that MCL 750.14; MSA 28.204, which by its express terms prohibits all abortions except those necessary to save the mother's life, was impliedly repealed by the Legislature's subsequent enactment of legislation that regulated, rather than prohibited, abortions. Defendant argues that the district court properly held that there is a clear conflict because the subsequent statutes purport to regulate conduct that MCL 750.14; MSA 28.204 makes criminal. We disagree.

The subsequent legislative enactments defendant relies on are statutes requiring parental consent,[3] informed consent,[4] and record keeping,[5] providing immunity for those who refuse to perform abortions,[6] prohibiting partial-birth abortions,[7] and prohibiting Medicaid funding for abortions.[8]

---

[3] MCL 722.901 *et seq.*; MSA 25.248(101) *et seq.*, known as the Parental Rights Restoration Act.

[4] MCL 333.17014; MSA 14.15(17014), MCL 333.17015; MSA 14.15(17015), MCL 333.17515; MSA 14.15(17515).

[5] MCL 333.2835; MSA 14.15(2835).

[6] MCL 333.20181-333.20184; MSA 14.15(20181)-14.15(20184).

[7] MCL 333.17016; MSA 14.15(17016), MCL 333.17516; MSA 14.15(17516).

[8] MCL 400.1 *et seq.*; MSA 16.401 *et seq.*

Repeals by implication are not favored and will not be indulged in if there is any other reasonable construction. *Wayne Co Prosecutor v Dep't of Corrections*, 451 Mich 569, 576; 548 NW2d 900 (1996). The intent to repeal must very clearly appear, and courts will not hold to a repeal if they can find reasonable ground to hold the contrary. *Id.* The presumption is always against the intention to repeal where express terms are not used, and the implication, in order to be operative, must be necessary. *House Speaker v State Administrative Bd*, 441 Mich 547, 562; 495 NW2d 539 (1993), quoting *Attorney General ex rel Owen v Joyce*, 233 Mich 619, 621; 207 NW 863 (1926) (citation omitted). The Legislature is presumed to act with knowledge of appellate court statutory interpretations, *Gordon Sel-Way, Inc v Spence Bros, Inc*, 438 Mich 488, 505; 475 NW2d 704 (1991), and silence by the Legislature for many years following judicial construction of a statute suggests consent to that construction. *Baks v Moroun*, 227 Mich App 472, 489; 576 NW2d 413 (1998); *Craig v Larson*, 432 Mich 346, 353; 439 NW2d 899 (1989).

After *Bricker* was decided in 1973, the Legislature enacted various statutes regulating the performance of abortions, see ns 3-8, *supra*, but did not revise MCL 750.14; MSA 28.204. The Legislature is presumed to be aware of the *Bricker* Court's interpretation of MCL 750.14; MSA 28.204, which construction permits abortions to be performed in accordance with *Roe*. *Gordon Sel-Way, supra* at 505; *Craig, supra* at 353. We think it clear that in enacting those statutes after *Bricker*, the Legislature intended to regulate those abortions permitted by *Roe* and *Doe*, and *Bricker*, and did not intend to repeal the general prohibition of

abortions to the extent permitted by the federal constitution, as construed by the United States Supreme Court. We thus must reject defendant's argument that MCL 750.14; MSA 28.204 has been repealed by implication.

V

We also must reject defendant's argument that the *Bricker* Court's discussion of the constitutionality of the criminal abortion statute was mere dictum because Bricker was not a physician and therefore none of the constitutional underpinnings of *Roe* applied.

Black's Law Dictionary (7th ed) defines obiter dictum as "[a] judicial comment made during the course of delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential (though it may be considered persuasive)." The Michigan Supreme Court has declared, however, that " '[w]hen a court of last resort intentionally takes up, discusses and decides a question *germane* to, though not necessarily decisive of, the controversy, such decision is not a *dictum* but is a judicial act of the court which it will thereafter recognize as a binding decision.' " *Detroit v Michigan Public Utilities Comm*, 288 Mich 267, 299-300; 286 NW 368 (1939), quoting *Chase v American Cartage Co, Inc*, 176 Wis 235, 238; 186 NW 598 (1922). A decision of the Supreme Court is authoritative with regard to any point decided if the Court's opinion demonstrates "application of the judicial mind to the precise question adjudged, regardless of whether it was necessary to decide the question to decide the case." *People v*

*Bonoite,* 112 Mich App 167, 171; 315 NW2d 884 (1982).

In deciding whether Bricker's pre-*Roe* conviction under MCL 750.14; MSA 28.204 for conspiracy to commit an abortion was lawful, the *Bricker* Court found it necessary to determine *Roe's* effect on Michigan's criminal abortion statute. Rather than simply declare that *Roe* was inapplicable because Bricker was not a physician,[9] the Court squarely addressed the issue whether *Roe* and *Doe* required that Michigan's criminal abortion statute be declared completely void because it is incapable of constitutional construction, or whether the statute, in accordance with the dictates of *Roe,* could be construed to render it constitutional. The *Bricker* Court, thus, intentionally discussed and decided a question germane to the controversy—the constitutionality and scope of the criminal abortion statute after *Roe*—and this Court must accord that decision binding effect under *Detroit, supra* at 299-300, and *Bonoite, supra* at 171.

Defendant further argues that *Roe v Wade, supra,* held that "abortion statutes, as a unit, must fall," and that in every case involving a statute containing lan-

---

[9] The Court stated:

The Court of Appeals, noting defendant is not a physician, concluded that as to non-physicians, "[t]here is [a] sufficient state interest in both the protection of the health and safety of a pregnant woman and the protection of [the] society as a whole from the practice of medicine by persons not licensed as physicians to justify continued application of the abortion statute to those abortions performed by non-physicians."

Unfortunately, this conclusion, though embodying the spirit of the doctrine of *Roe v Wade, infra,* takes no note of the constitutional defect in the statute. [*Bricker, supra* at 527, quoting 42 Mich App 352, 356; 201 NW2d 647 (1972).]

guage similar to that considered in *Roe*, federal courts have struck down the entire statute and have not remanded the case to a state court for interpretation and limitation. None of the cases relied on,[10] however,

_____

[10] The first case defendant cites, *Guam Society of Obstetricians & Gynecologists v Ada*, 962 F2d 1366 (CA 9, 1992), addressed the constitutionality of legislation enacted in 1990 declaring all abortions crimes except cases of ectopic pregnancy and abortions in cases where two physicians practicing independently reasonably determined that the pregnancy would endanger the mother's life or gravely impair her health. The court, *id.* at 1372, struck down the statute as unconstitutional, rejecting Guam's argument that *Roe v Wade* has no force after *Webster v Reproductive Health Services*, 492 US 490; 109 S Ct 3040; 106 L Ed 2d 410 (1989), *Thornburgh v American College of Obstetricians & Gynecologists*, 476 US 747, 814; 106 S Ct 2169; 90 L Ed 2d 779 (1986) (overruled in *Planned Parenthood of Southeastern Pennsylvania v Casey*, 505 US 833; 112 S Ct 2791; 120 L Ed 2d 674 [1992]), and *Akron v Akron Center for Reproductive Health, Inc*, 462 US 416, 452; 103 S Ct 2481; 76 L Ed 2d 687 (1983) (overruled in *Casey, supra*). Defendant also cites *Smith v Bentley*, 493 F Supp 916 (ED Ark, 1980), which involved various Arkansas statutes, including one that made it

> "unlawful for anyone to administer or prescribe any medicine or drugs to any woman with child, with the intent to produce an abortion, or premature delivery of any foetus before or after the period of quickening, or to produce or attempt to produce such abortion by any other means . . . ." [*Id.* at 924.]

The *Smith* court noted that

> [t]he statute, by its own terms, applies to "anyone." Ostensibly, the term "anyone" includes licensed physicians such as the plaintiffs. While dicta in one Arkansas Supreme Court decision intimates that the application of the statute may be circumscribed in terms of its application to physicians who perform abortions prior to the time when the fetus becomes viable, no Arkansas decision expressly excludes physicians from the statute's prohibitions or delineates the circumstances which would subject a physician to criminal liability for the performance of an abortion. [*Id.* at 925-926.]

The *Smith* court was referring to *May v State*, 254 Ark 194, 196; 492 SW2d 888 (1973), in which the Arkansas Supreme Court concluded that the appellant lacked standing to challenge the statute's constitutionality and stated that *Roe* and *Doe*'s effect was to strike down the prohibition as against physicians during the period preceding approximately the end of the first trimester. The *May* court determined that "[t]he cited section can be left intact as to laymen . . . ." See *Smith, supra* at 926, n 9, concluding

involved the state's highest court's construction of the abortion statute at issue as coextensive with *Roe v Wade, supra.* We must accept the *Bricker* Court's construction of the statute as our starting point.[11] For this reason, defendant's argument must fail.

VI

Defendant argues that MCL 750.14; MSA 28.204 is unconstitutionally vague because the threat of prosecution against physicians is an undue burden on the rights of women seeking lawful elective and therapeutic abortions, that the statute fails to provide reasonable notice of which abortions are prohibited because it defines the prohibited conduct by reference to unclear and ever-changing constitutional principles, and that the statute is unconstitutionally vague as construed in *Bricker, supra,* because it fails to recognize the attending physician's constitutionally conclusive medical judgment regarding viability or maternal health, fails to specify whether an objective or subjective standard governs, and fails to include mens rea requirements on these issues.

As is evident from the dissent's discussion of the merits, defendant raises substantial constitutional issues. We must conclude, however, that these arguments cannot insulate defendant from prosecution in the instant case.

---

that the quoted statement "does not rehabilitate the patent facial invalidity [of the statute] in terms of the statute's application to physicians."

[11] "When a state statute has been construed to forbid identifiable conduct so that 'interpretation by (the state court) puts these words in the statute as definitely as if it had been so amended by the legislature,' claims of impermissible vagueness must be judged in that light." *Wainwright v Stone,* 414 US 21, 22-23; 94 S Ct 190; 38 L Ed 2d 179 (1973), quoting *Winters v New York,* 333 US 507, 514; 68 S Ct 665; 92 L Ed 840 (1948).

The invariable practice of the courts is not to consider the constitutionality of legislation unless it is imperatively required, essential to the disposition of the case, and unavoidable. Thus, a court will inquire into the constitutionality of a statute only when and to the extent that a case before it requires entry upon that duty, and only to the extent that it is essential to the protection of the rights of the parties concerned. [16 Am Jur 2d, Constitutional Law, § 117, p 512-513.]

Due regard for principles of standing, and recognition that declaring a statute unconstitutional is " 'the gravest and most delicate duty that this Court is called on to perform,' " mandate that, outside the context of the First Amendment, "one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional." [*People v Lynch*, 410 Mich 343, 352; 301 NW2d 796 (1981), quoting *United States v Raines*, 362 US 17, 20-21; 80 S Ct 519; 4 L Ed 2d 524 (1960), quoting *Blodgett v Holden*, 275 US 142-148; 48 S Ct 105; 72 L Ed 206 (1927) (Holmes, J.).][12]

The repeated declarations by the United States Supreme Court that the determination of viability is a matter for medical judgment, *Colautti v Franklin*,

---

[12] See *People v Cavaiani*, 172 Mich App 706, 714; 432 NW2d 409 (1988) (noting that a defendant has standing to raise vagueness challenges to a statute only if the statute is vague as applied to his conduct; that "[e]ven though a statute may be susceptible to impermissible interpretations, reversal is not required where the statute can be narrowly construed so as to render it sufficiently definite to avoid vagueness and where defendant's conduct falls within that prescribed by the properly construed statute"; and that a person generally lacks standing to challenge overbreadth where his own conduct is clearly within contemplation of the statute); *People v Williams*, 142 Mich App 611, 612; 370 NW2d 7 (1985) (noting that vagueness challenges to statutes that do not involve First Amendment freedoms must be examined in light of the facts of the case at hand, and that for a defendant to have standing to challenge a statute as overbroad, the statute must be " ' "overbroad in relation to defendant's conduct." ' " [Citations omitted].)

439 US 379, 386-389; 99 S Ct 675; 58 L Ed 2d 596 (1979), overruled in part in *Webster v Reproductive Health Services*, 492 US 490; 109 S Ct 3040; 106 L Ed 2d 410 (1989), and the fact that fetuses may now become viable long before a pregnancy reaches twenty-eight weeks, may, indeed, raise issues regarding the application and constitutionality of the statute as construed in *Bricker*, in a case where it is charged that the defendant intervened to abort a pregnancy of less than twenty-eight weeks' gestation.[13] These issues are not presented, however, in the instant prosecution because MCL 750.14; MSA 28.204 as construed in *Bricker, supra*, clearly reaches the conduct the prosecution contends is involved in this criminal prosecution.

A

We are unable to agree with the dissent that defendant may resist this prosecution on constitutional grounds because of deficiencies in the criminal complaint.

Grounded in a defendant's constitutional right of due process of law is the principle that "[a]n accused shall not be called upon to defend himself against a charge of which he was not sufficiently apprised."

---

[13] Defendant's argument that the line between legal and criminal activity is ever changing as the jurisprudence in this area changes is based on the presumption that the statute and *Bricker* automatically operate to permit prosecution whenever prosecution is permissible under the federal constitution, regardless of whether prosecution would be permitted under *Roe* and *Doe*. The prosecution, however, asserts that it has no such authority, and under *Bricker*, the legal line of criminal prohibition is twenty-eight weeks. This is a question that need not be decided in this case, because this prosecution specifically alleges the termination of a twenty-eight-week pregnancy.

*People v Mast,* 126 Mich App 658, 661; 337 NW2d 619 (1983), *(On Rehearing),* 128 Mich App 613; 341 NW2d 117 (1983).

We first note that because the district court dismissed the abortion charge against defendant before the preliminary examination, no criminal information was issued pertinent to that charge. See MCR 6.112(B), which provides that no information may be filed against a defendant until a preliminary examination has been held or has been waived, unless the defendant is a fugitive from justice.

The requirements for a criminal complaint are not the same as for an indictment or information. MCR 6.101 provides in pertinent part:

> (A) Definition and Form. A complaint is a written accusation that a named or described person has committed a specified criminal offense. The complaint must include the substance of the accusation against the accused and the name and statutory citation of the offense.
>
> (B) Signature and Oath. The complaint must be signed and sworn to before a judicial officer or court clerk.

"The primary function of a complaint is to move the magistrate to determine whether a warrant shall issue." *Wayne Co Prosecutor v Recorder's Court Judge,* 119 Mich App 159, 162; 326 NW2d 825 (1982); see also MCL 764.1a(1); MSA 28.860(1)(1).

The requirements for an information are set forth in MCL 767.45(1); MSA 28.985(1), which provides in pertinent part:

> The indictment or information shall contain all of the following:

(a) The nature of the offense stated in language which
will fairly apprise the accused and the court of the offense
charged.

(b) The time of the offense as near as may be. No vari-
ance as to time shall be fatal unless time is of the essence
of the offense.

(c) That the offense was committed in the county or
within the jurisdiction of the court.

The test for sufficiency of an indictment is:

" 'Does it identify the charge against the·defendant so that
his conviction or acquittal will bar a subsequent charge for
the same offense; does it notify him of the nature and char-
acter of the crime with which he is charged so as to enable
him to prepare his defense and to permit the court to pro-
nounce judgment according to the right of the case?' " [*Peo-
ple v Weathersby*, 204 Mich App 98, 101; 514 NW2d 493
(1994), quoting *People v Adams*, 389 Mich 222, 243; 205
NW2d 415 (1973), quoting *People v Weiss*, 252 AD 463, 467-
468; 300 NYS 249 (1937), rev'd on other grounds 276 NY
384; 12 NE2d 514 (1938).]

An information may be amended at any time before,
during, or after trial to cure any defect, imperfection,
or omission in form or substance, including a vari-
ance between the information and the proofs, as long
as the accused is not prejudiced by the amendment
and the amendment does not charge a new crime.
MCL 767.76; MSA 28.1016; *People v Stricklin*, 162
Mich App 623, 633; 413 NW2d 457 (1987).

We conclude that the factual allegations in the
instant complaint[14] were sufficient under the above

---

[14] The complaint stated in pertinent part:

With respect to the allegation of records alteration, Complainant
has determined the following to be true upon information and
belief:

Defendant is a medical doctor practicing from two clinics, one in Highland Park, Michigan, the other in Bloomfield Hills, Michigan. Virtually, the exclusive nature of Defendant's medical practice is performing abortions upon request of pregnant women. Dr. Higuera maintains a medical file with respect to each patient whom he has examined. Complainant has been informed by Rebecca Black, a former employee of Dr. Higuera that it was routine practice for Dr. Higuera to have one or more ultrasound diagnostic examinations performed on a woman who requested an abortion. The ultrasound was, in most cases, performed by Rebecca Black pursuant to her responsibilities as Dr. Higuera's employee. According to Rebecca Black the ultrasound was used by Dr. Higuera for several medical purposes, including determination of the age and size of the fetus prior to an abortion. A form was routinely filled out which indicated the ultrasound determination of age of the fetus and said form was maintained in the patient's file as a standard part of the office keeping practices in Dr. Higuera's clinics.

Complainant is informed that Jane Doe . . . on October 14, 1994 appeared at Dr. Higuera's office pursuant to an appointment. Ms. Doe indicated that a nurse (Rebecca Black) performed an ultrasound examination upon her and the *ultrasound revealed that the fetus was 28 weeks old*. The nurse then informed Ms. Doe that it might not be possible to perform the abortion as she had requested. The nurse further stated, however, that Dr. Higuera had to make the final determination. *Dr. Higuera then entered the examination room and himself repeated the ultrasound on Ms. Doe.* Rebecca Black has informed Complainant that *she observed Dr. Higuera examine Jane with the ultrasound device and saw that the ultrasound again determined the fetus to be 28 weeks of age; the same age as the instrument had determined when she had previously performed the test herself.* Rebecca Black filled out the ultrasound reporting form showing *28 weeks* as determined by the ultrasound instrument both when she performed the test and when Defendant Higuera performed the test and placed that form in her file. Dr. Higuera then performed a 2-day abortion procedure (described further infra) terminating the pregnancy of Jane Doe.

Rebecca Black has further informed Complainant that Dr. Higuera performed abortions on fetuses more than 24 weeks old regularly during the last year that she worked for him.

Complainant has interviewed Assistant Attorney General Merry A. Rosenberg assigned to the Attorney General's Health Professionals Division. Complainant has been advised by Merry Rosenberg that her division received a complaint from Rebecca Black, who terminated her employment with Dr. Higuera, indicating the Dr. Higuera was, among other complaints, routinely performing abortions in the third trimester of pregnancy without a finding of medical necessity to the mother. Merry Rosenberg indicated to Com-

plainant that she received the name of Jane Doe from Rebecca Black and, as an Assistant Attorney General representing the medical licensing board of the State of Michigan, demanded from Dr. Higuera the medical file concerning his examination of and abortion upon Jane Doe. Merry Rosenberg also indicated that Rebecca Black provided a copy of the medical file of Jane Doe which she had made prior to her termination of employment with Dr. Higuera. Included in the medical file provided by Rebecca Black was *a copy of the ultrasound form showing 28 weeks as the age of the Jane Doe fetus.* When Merry Rosenberg received the patient file from Dr. Higuera, which she had demanded, there was an ultrasound form in the file showing the fetus' age to be 24 weeks and there was *no form in the file indicating the 28 week fetus* which had previously been provided by Rebecca Black.

Complainant is further advised that Merry Rosenberg engaged the services of Eric and Leonard Speckin, Forensic Document Examiners. Eric Speckin analyzed the documents which had been provided to Merry Rosenberg by Dr. Higuera and determined two significant forensic conclusions: *First, that the file had previously contained a 28 week form due to impressions of that form found engraved into other documents in the file.* Second, that the 24 week form, which was included in the file provided to Merry Rosenberg, was written with ink which was approximately six months newer than the October 14, 1994 date which appears on the form. Complainant advises this Court that assuming the conclusions of Eric Speckin to be true and accurate the 24 week ultrasound form was prepared after the demand for production of documents filed by Merry Rosenberg.

\*     \*     \*

Jane Doe has stated that due to the extremely mild nature of her pregnancies and ovulation cycle she was not at all aware of the exact stage of her pregnancy. She wished to have an abortion for purely personal reasons and she was aware of no medical need supporting an abortion. She recalls the nurse, Rebecca Black, doing an ultrasound on her and informing her that there was a problem because she might be too far advanced and then she recalls Dr. Higuera performing a second ultrasound and informing her that an abortion was possible in her case. *Dr. Higuera advised her that there would be an increase in the cost of the abortion due to the age of her fetus* but did not advise her of what the age was. Jane Doe advised Complainant that she was further quite surprised when *Dr. Higuera advised her after performing the first stage of a 2-day abortion procedure that this procedure was capable of inducing labor. Dr. Higuera then warned Jane Doe that if she went into labor before returning to his clinic the next day for completion of the abortion process she should not go to a hospital*

standards because they adequately inform of the substance of the accusations. In addition, the factual allegations provide the basis from which commission of the legal elements of the charge can be inferred. Any deficiencies in the allegations of the actual charge, such as the failure to specifically allege that defen-

---

*or call 911 emergency service because "they" (the hospital) would deliver a live baby for her.* Jane Doe recalled that she was shocked by this statement because that was the first indication which she had that her baby was at an age where it could survive on its own. Jane Doe further advised that she allowed Dr. Higuera to complete the abortion process on the second day, October 15, 1994, and terminate her pregnancy.

Rebecca Black has advised Complainant that the procedure used by Dr. Higuera to cause abortions is the insertion of items known as "laminaria" which induce abortion in a 2-day procedure. Complainant has been informed by several experts including Dr. James Gell, M.D., and Dr. Mark Evans, M.D., that *absent evidence to the contrary, a 28-week old fetus can be expected to survive and develop normally outside the mother's womb.*

In consequence of the above, Complainant states that:

### COUNT I

Jose Gilberto Higuera, on or about May 15, 1995, . . . while being a health care provider, intentionally and willfully, did himself or direct another to place in a patient's medical chart (to wit: Jane Doe) misleading or inaccurate information regarding the diagnosis of the patient's condition (to wit: the age and developmental state of the fetus carried by Jane Doe, contrary to the provisions of MCL 750.492a(1)(a) [MSA 28.760(1)(1)(a)], and against the peace and dignity of the People of the State of Michigan.

Penalty: Felony, 4 years in prison.

### COUNT II

Jose Gilberto Higuera did, on or about October 14 and 15, 1994, while in the City of Highland Park . . . willfully administer to a pregnant woman (to wit: Jane Doe) any medicine, drug, substance or thing whatever, or did employ any instrument or any means whatever with the intent thereby to procure the miscarriage of the said Jane Doe who was then and there pregnant and carrying *a fetus approximately 28 weeks of age,* without there having been a necessity to perform such procedure to preserve the life of the said woman, contrary to the provisions of MCL 750.14 [MSA 28.204] . . . . [Emphasis added.]

dant believed that the fetus was viable and that he did not believe that the procedure was necessary to preserve the health of the mother, can be cured by amendment.[15]

B

It is, of course, evident that the statute does not state a mens rea requirement or set forth an objective or subjective standard for evaluating such a requirement.[16] However, *Bricker* construed the statute as

---

[15] The district court rejected defendant's argument that the complaint was defective, although it otherwise dismissed the charge on the ground that the criminal abortion statute was unconstitutionally vague. The court concluded that the complaint was not defective for failure to allege that the fetus was viable, that the complaint was, however, defective for failure to allege lack of necessity to preserve the health of the mother, but that the defect did not require dismissal and could be corrected by a motion to amend by the prosecution.

[16] *Women's Medical Professional Corp v Voinovich*, 130 F3d 187 (CA 6, 1997), relied on by defendant, involved a statute that specifically set forth a standard that was both subjective and objective. The statute in *Colautti*, *supra*, suffered from a similar infirmity. In *Voinovich*, *supra*, the court, relying, in part, on *Colautti*, held that the medical necessity and medical emergency provisions of the Ohio abortion act regulating postviability abortions, Ohio Rev Code Ann § 2919.16(F), were unconstitutionally vague:

We conclude that the medical necessity and medical emergency provisions are unconstitutionally vague, because they lack scienter requirements. Because the constitutionality of the post-viability regulations depends upon the constitutionality of these two provisions, all of the post-viability regulations must be struck down.

2. Lack of Scienter Requirement

The term "scienter" means "knowingly" and is used to signify a defendant's guilty knowledge. Black's Law Dictionary 1345 (6th ed 1990). It requires that a defendant have some degree of guilty knowledge or culpability in order to be found criminally liable for some conduct. Statutes imposing criminal liability without a mental culpability requirement are generally disfavored. See *Staples v United States*, 511 US 600, 605-06, 114 S Ct 1793, 1797, 128 L Ed 2d 608 (1994).

encompassing all the constitutional requirements and safeguards demanded by *Roe* and *Doe*, including the need to accord adequate deference to the physician's exercise of his medical judgment. The statute, as interpreted in *Bricker*, contemplates deference to the subjective good-faith medical judgment of the physician. Thus, in the instant case, the information must allege, and, to convict, the prosecution must prove, that the fetus was twenty-eight weeks old and viable, that defendant himself subjectively believed that the fetus was twenty-eight weeks old and viable, and that defendant, in his own mind, did not hold the subjective belief or medical judgment that the procedure was necessary to preserve the life or health of the mother.

In light of *Bricker*, we reverse the lower courts' dismissal of the charge and remand for reinstatement of

---

The Act's "medical emergency" definition requires the physician to determine "in good faith and in the exercise of reasonable medical judgment" whether an emergency exists. Ohio Rev Code Ann § 2919.16(F). Similarly, the medical necessity exception to the post-viability ban requires that the physician determine "in good faith and in the exercise of reasonable medical judgment" that the abortion is necessary. See *id.* § 2919.17(A)(1). Thus, *both of these provisions contain subjective and objective elements* in that a physician must believe that the abortion is necessary and his belief must be objectively reasonable to other physicians. This dual standard as written contains no scienter requirement. *Therefore, a physician may act in good faith and yet still be held criminally and civilly liable if, after the fact, other physicians determine that the physician's medical judgment was not reasonable.* In other words, a physician need not act wilfully or recklessly in determining whether a medical emergency or medical necessity exists in order to be held criminally or civilly liable; rather, under the Act, physicians face liability even if they act in good faith according to their own best medical judgment. [*Voinovich, supra* at 203-204. Emphasis added.]

the charge and further proceedings consistent with this opinion. We do not retain jurisdiction.

M. J. KELLY, P.J., concurred.

JANSEN, J. (*concurring in part and dissenting in part*). I concur with parts II through V of the majority opinion. I must dissent from part VI because I believe that the statute, MCL 750.14; MSA 28.204, is unconstitutionally vague, even as construed by *People v Bricker*, 389 Mich 524; 208 NW2d 172 (1973), because the statute fails to recognize the attending physician's constitutionally conclusive medical judgment regarding viability of the fetus or maternal health, fails to specify whether an objective or subjective standard governs, and fails to include a mens rea requirement. The constitutional deficiency of the statute has been compounded in this action by the criminal complaint, which is completely deficient in its allegations regarding defendant's conduct and cannot be saved by mere amendment. It is clear that the statute cannot pass constitutional muster in light of *Roe v Wade*, 410 US 113; 93 S Ct 705; 35 L Ed 2d 147 (1973), and if the Legislature wishes to regulate abortion, then it must do so in a constitutional manner that acknowledges *Roe* and its twenty-seven years of reaffirmation by the United States Supreme Court.

This case arises out of an abortion performed by defendant, a medical doctor, on a woman (who will be referred to as the patient) on October 14 and 15, 1994. Defendant owned and operated two medical clinics in the cities of Highland Park and Bloomfield Hills. On October 14, 1994, the patient presented herself to the clinic in Highland Park because she wished to have an abortion. During the preliminary examina-

tion, the patient testified that she believed she was twenty-one or twenty-two weeks pregnant at the time she went to the clinic. In fact, she wrote on her form at the clinic that the date of her last menstrual period was April 25, 1994. According to a pregnancy calculator, using the last date of the patient's menstrual period, the patient was twenty-three or twenty-four weeks pregnant.

On October 14, 1994, the patient had an ultrasound performed on her by Rebecca Black, who has never been licensed or certified as an ultrasound sonographer. While performing the ultrasound, Black informed the patient that she might be "further along" in the pregnancy than believed and that it might not be possible to perform the abortion. The patient's testimony concerning the term of the pregnancy is entirely unclear. First, the patient stated that defendant performed an ultrasound himself immediately after Black performed one and defendant told the patient that her pregnancy had developed to "28½ weeks or something like that." However, the patient had previously given testimony under oath before the state licensing board that she believed that defendant told her that the fetus was 27 or 27½ weeks. The patient testified before the licensing board that Black also informed her that the fetus was 27 or 27½ weeks.

According to the patient, the cost of an abortion varied in relation to the term of the pregnancy. Thus, when the patient first called defendant's clinic, she was told that the cost of an abortion, based on what the patient informed the receptionist regarding her gestational pregnancy, would be about $1,400 to $1,600. However, the patient stated that when defendant informed her that the pregnancy was actually

later term (twenty-eight weeks), she was told that the cost would be $3,000 for the abortion.

Rebecca Black, who identified herself as the medical supervisor and ultrasound technologist in defendant's two clinics, stated that she had worked for defendant for eight years and that she was fired in November 1994. Black, as has been stated, was neither licensed nor certified as an ultrasound sonographer, and her training consisted of learning ultrasound from a woman who was going to school to learn how to perform ultrasounds at a clinic where Black worked before working for defendant. Black testified that she believed that the development of the fetus was twenty-eight weeks, but conceded that a physician determines the gestational age of a fetus on the basis of the ultrasound images. Black further stated that she wrote down in the patient's record that the age of the fetus was twenty-eight weeks, and Black had a photostatic copy of that record with her at the preliminary examination. However, that record was never signed or initialed by defendant and the patient's original medical record indicates that the fetus was at twenty-four weeks gestation.

Additionally, Black had reported defendant to the Wayne County Medical Society for allegedly performing late-term abortions in late October or early November 1994. Black was apparently fired shortly after this report was filed. Black admitted that she had removed original documents and made copies of other documents from patients' files, without the knowledge or consent of the patients, to give to an investigator in order to build a case against defendant. In fact, Black admitted that she was told by Alice White of the Wayne County Medical Society that

Black would need to collect evidence to support her claims against defendant. Thus, Black spent the final six to eight weeks of her job collecting documents from patients' medical files and turned them over to an investigator. Apparently, the propriety of Black's conduct is not the subject of an investigation by the Attorney General's office.

The criminal complaint, dated July 25, 1996, charged defendant with two counts: altering a patient's medical records, MCL 750.492a(1)(a); MSA 28.760(1)(1)(a), and violation of the criminal abortion statute, MCL 750.14; MSA 28.204. Specifically, count II of the complaint alleges:

> Jose Gilberto Higuera did, on or about October 14 and 15, 1994, while in the City of Highland Park, County of Wayne, willfully administer to a pregnant woman (to wit: Jane Doe) any medicine, drug, substance or thing whatever, or did employ any instrument or any means whatever, with the intent thereby to procure the miscarriage of the said Jane Doe who was then and there pregnant and carrying a fetus approximately 28 weeks of age, without there having been a necessity to perform such procedure to preserve the life of the said woman, contrary to the provisions of MCL 750.14 [MSA 28.204], and against the peace and dignity of the People of the State of Michigan. Penalty: Felony, 4 years in prison.

MCL 750.14; MSA 28.204 states:

> Any person who shall wilfully administer to any pregnant woman any medicine, drug, substance or thing whatever, or shall employ any instrument or other means whatever, with intent thereby to procure the miscarriage of any such woman, unless the same shall have been necessary to preserve the life of such woman, shall be guilty of a felony, and in case the death of such pregnant woman be thereby produced, the offense shall be deemed manslaughter.

In any prosecution under this section, it shall not be nec-
essary for the prosecution to prove that no such necessity
existed.

The statute as written obviously cannot pass consti-
tutional muster in light of the United States Supreme
Court's decision in *Roe*. In an effort to save the stat-
ute from its constitutional deficiencies, our Supreme
Court in *Bricker*, construed the statute so that it
would not violate the dictates of *Roe*. In *Bricker*,
*supra*, pp 529-531, the Court stated:

In light of the declared public policy of this state [to pro-
scribe abortion] and the changed circumstances resulting
from the Federal constitutional doctrine elucidated in *Roe*
and *Doe* [*v Bolton*, 410 US 179; 93 S Ct 739; 35 L Ed 2d 201
(1973)], we construe § 14 of the penal code to mean that
the prohibition of this section shall not apply to "miscar-
riages" authorized by a pregnant woman's attending physi-
cian in the exercise of [the physician's] medical judgment;
the effectuation of the decision to abort is also left to the
physician's judgment; however, a physician may not cause a
miscarriage after viability except where necessary, in [the
physician's] medical judgment, to preserve the life or health
of the mother.

\*          \*          \*

. . . We hold that, except as to those cases defined and
exempted under *Roe v Wade* and *Doe v Bolton*, *supra*, crim-
inal responsibility attaches.

Although the parties expend a great deal of argu-
ment concerning a "trimester framework," the issue
of viability of the fetus is critical because that is the
constitutional standard. There is no "line-drawing" or
judicial assumptions concerning the issue of viability.
In *Roe*, *supra*, pp 164-165, the United States Supreme
Court stated that, "[f]or the stage subsequent to *via-*

*bility*, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." (Emphasis added). The Court's opinion in *Bricker, supra*, p 530, is in accord with *Roe* because the Court held that "the effectuation of the decision to abort is also left to the physician's judgment; however, a physician may not cause a miscarriage after viability except where necessary, in [the physician's] medical judgment, to preserve the life or health of the mother."

In *Planned Parenthood of Southeastern Pennsylvania v Casey*, 505 US 833; 112 S Ct 2791; 120 L Ed 2d 674 (1992), a majority of the justices reaffirmed the "essential holding" of *Roe*. Justice O'Connor, writing for a majority, stated at pp 846 and 860:

> It must be stated at the outset and with clarity that *Roe's* essential holding, the holding we reaffirm, has three parts. First is a recognition of the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State. Before viability, the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure. Second is a confirmation of the State's power to restrict abortions after fetal viability, if the law contains exceptions for pregnancies which endanger the woman's life or health. And third is the principle that the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child.
>
> We have seen how time has overtaken some of *Roe's* factual assumptions: advances in maternal health care allow for abortions safe to the mother later in pregnancy than was true in 1973, . . . and advances in neonatal care have

advanced viability to a point somewhat earlier. . . . But these facts go only to the scheme of time limits on the realization of competing interests, and the divergences from the factual premises of 1973 have no bearing on the validity of *Roe's* central holding, that viability marks the earliest point at which the State's interest in fetal life is constitutionally adequate to justify a legislative ban on nontherapeutic abortions. The soundness or unsoundness of that constitutional judgment in no sense turns on whether viability occurs at approximately 28 weeks, as was usual at the time of *Roe*, at 23 to 24 weeks, as it sometimes does today, or at some moment even slightly earlier in pregnancy, as it may if fetal respiratory capacity can somehow be enhanced in the future. Whenever it may occur, the attainment of viability may continue to serve as the critical fact, just as it has done since *Roe* was decided . . . .

Thus, *Roe* and *Bricker* and subsequent United States Supreme Court cases establish a proscription of abortions at the stage of viability (with the exception of endangerment to the life or health of the woman), not at the beginning of the third trimester or after passage of a certain number of gestational weeks. With regard to determining viability, the United States Supreme Court has stated:

In these three cases, [*Roe, supra; Doe, supra; Planned Parenthood of Central Missouri v Danforth*, 428 US 52; 96 S Ct 2831; 49 L Ed 2d 788 (1976)] then, this Court has stressed viability, has declared its determination to be a matter for medical judgment, and has recognized that differing legal consequences ensue upon the near and far sides of that point in the human gestation period. We reaffirm these principles. Viability is reached when, in the judgment of the attending physician on the particular facts of the case before him, there is a reasonable likelihood of the fetus' sustained survival outside the womb, with or without artificial support. Because this point may differ with each pregnancy, neither the legislature nor the courts may proclaim

one of the elements entering into the ascertainment of via-
bility—be it weeks of gestation or fetal weight or any other
single factor—as the determinant of when the State has a
compelling interest in the life or health of the fetus. Viabil-
ity is the critical point. [*Colautti v Franklin*, 439 US 379,
388-389; 99 S Ct 675; 58 L Ed 2d 596 (1979).]

In the present case, regardless of the actual age of
the fetus, which is obviously a matter of factual dis-
pute, the question is whether the fetus was viable at
the time of the abortion. There is no allegation in the
complaint that defendant aborted a postviable,
healthy fetus or that the abortion was unnecessary to
protect the mother's life or health. Because the crimi-
nal complaint does not allege that the fetus was via-
ble in the judgment of defendant (the attending physi-
cian) in light of the particular facts of the case before
him or that there was a reasonable likelihood of the
fetus' sustained survival outside the womb with or
without life support, I would find that the criminal
abortion statute is unconstitutionally vague as applied
to his alleged conduct.

In order to pass constitutional muster, a penal stat-
ute must define the criminal offense with sufficient
definiteness so that ordinary people can understand
what conduct is proscribed and in a manner that does
not encourage arbitrary and discriminatory enforce-
ment. *People v Lino*, 447 Mich 567, 575; 527 NW2d
434 (1994). There are at least three ways in which a
penal statute may be found to be unconstitutionally
vague: (1) failure to provide fair notice of what con-
duct is prohibited, (2) encouragement of arbitrary and
discriminatory enforcement, or (3) being overbroad
and impinging on First Amendment freedoms. *Id.*,
pp 575-576. Vagueness challenges that do not impli-

cate First Amendment freedoms (such as the present case) are examined in light of the facts of each particular case. *Id.*, p 575. When making a vagueness determination, a court must also take into consideration any judicial constructions of the statute. *Id.*

The constitutional deficiency with § 14 of the Penal Code, even as interpreted in *Bricker*, is that the statute does not tie the determination of viability to the attending physician's exercise of medical judgment. This deficiency has been compounded here by the criminal complaint. The Attorney General has charged defendant under § 14 for allegedly causing the miscarriage of a fetus that reached approximately twenty-eight weeks of age. The Attorney General argues that *Roe* and *Bricker* set forth a trimester framework by which to determine when the state can proscribe, and thus criminally prosecute, the performance of abortions, and that abortions performed after twenty-six weeks are, because of the age of the fetus alone, prohibited.[1] First, the Attorney General misapprehends the principles of *Roe* and *Bricker* and ignores the twenty-seven years of case law since *Roe* was decided. It is clear that there is no "trimester framework" and that viability is the critical point. Thus, the criminal complaint here allows the jury to determine the age of the fetus and determine whether the fetus was viable. Under existing United States Supreme Court precedent, it is clear that interpretation of the

---

[1] This case illustrates the problem with engrafting the requirements of a United States Supreme Court decision onto an otherwise unconstitutional statute in order to save the statute. If the Attorney General, trained in and well-versed in the law, misapprehends the constitutional dictates as set forth by the United States Supreme Court, how then can other citizens not trained in the law be expected to know what conduct is or is not proscribed?

criminal abortion statute in this manner is unconstitutional.

In *Colautti*, the United States Supreme Court struck down a section of a Pennsylvania statute on the basis that it was unconstitutionally vague. Specifically, the Court held that the viability-determination requirement was ambiguous and its ambiguity was compounded by the fact that the statute subjected the physician to potential criminal liability without regard to fault with respect to the finding of viability. See *Colautti, supra*, p 390. The statute required the physician to conform to the prescribed standard of care if the physician determined that the fetus was viable or if there was sufficient reason to believe that the fetus may be viable. Holding that viability must be that as defined in *Roe* and *Danforth*, the Court found the "may be viable" requirement to refer to a condition that differed in some indeterminate way from the definition of viability as set forth in *Roe* and *Danforth*. *Id.*, p 393. The Court held that the statute did not allow the physician to make a determination in light of all attendant circumstances (psychological, emotional, and physical) that might be relevant to the well-being of the patient; rather, the statute conditioned potential criminal liability on confusing and ambiguous criteria and, therefore, presented "serious problems of notice, discriminatory application, and chilling effect on the exercise of constitutional rights." *Id.*, p 394.

In ruling that the viability-determination requirement was ambiguous, the Court also held that the statute impermissibly subjected the physician to criminal liability without regard to fault. The Court noted that the statute did not require the physician to be

culpable in failing to find sufficient reason to believe that the fetus may be viable. Because of the absence of a scienter requirement in the provision directing the physician to determine whether the fetus is or may be viable, the statue was said to be little more than " 'a trap for those who act in good faith.' " *Id.*, p 395, quoting *United States v Ragen*, 314 US 513, 524; 62 S Ct 374; 86 L Ed 383 (1942). Consequently, the Court held that the determination whether a particular fetus is viable is, and must be, a matter for the judgment of the responsible attending physician. To be constitutional, state regulation that impinges on such a determination must allow the physician the room the physician needs to make the best medical judgment. *Colautti, supra,* p 397.

Recently, in *Stenberg v Carhart*, 530 US 914; 120 S Ct 2597; 147 L Ed 2d 743 (2000), the United States Supreme Court reiterated the *Roe* and *Casey* postviability requirement that "the governing standard requires an exception 'where it is necessary, in appropriate medical judgment for the preservation of the life or health of the mother.' " *Id.*, 530 US 931, quoting *Casey, supra,* p 879. In *Stenberg*, the Court was faced with a Nebraska statute that purported to make criminal the performance of a "partial birth abortion." The Court found, inter alia, that the statute was unconstitutional because it lacked any exception for the preservation of the health of the mother. *Stenberg, supra,* 530 US 930. The Court, however, did not merely engraft the exception onto the statute.

In the present case, neither the statute nor our Supreme Court's interpretation in *Bricker* allows the physician to determine whether the fetus is viable in the judgment of the attending physician in light of the

particular facts before the physician. Moreover, there is no scienter requirement regarding the determination of viability or the determination of medical necessity. The reason for these requirements was aptly stated in *Women's Medical Professional Corp v Voinovich*, 130 F3d 187, 205 (CA 6, 1997), where the court said, "[t]he determination of whether a medical emergency or necessity exists, like the determination of whether a fetus is viable, is fraught with uncertainty and susceptible to being subsequently disputed by others."

Accordingly, in light of the constitutional deficiencies of our criminal abortion statute, even with *Bricker's* judicial interpretation imposed, the statute must be declared unconstitutionally vague. I would affirm the lower courts' finding that the statute is unconstitutionally vague, albeit using a different analysis than the lower courts, and affirm the dismissal of the charge against defendant under the criminal abortion statute.