*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

UNPUBLISHED
June 4, 2020

v

No. 340943
Wayne Circuit Court
LC No. 16-006766-01-FC

DWUAN TAMAUL PARKMAN,

Defendant-Appellant.

Before: RIORDAN, P.J., and JANSEN and STEPHENS, JJ.

PER CURIAM.

Following his second jury trial,[1] defendant, Dwuan Tamaul Parkman, appeals as of right his jury convictions of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(c), and first-degree home invasion, MCL 750.110a(2). The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to a prison term of 35 years to 35 years and a day for the CSC-I conviction, and a consecutive prison term of 20 to 30 years for the first-degree home invasion conviction.[2] We affirm defendant's convictions, but remand for further sentencing proceedings consistent with this opinion.

## I. FACTUAL BACKGROUND

Defendant's convictions arise out of a sexual assault perpetrated against an 18-year-old Canadian flight attendant ("the victim") while she was staying overnight at a hotel near Detroit Metropolitan Airport. Defendant, who was a "regular" at the "Wheat & Rye" restaurant and bar that the victim patronized on the evening in question with two of her coworkers, followed the victim back to her hotel, the "Days Inn" hotel in Romulus. He waited until she was asleep, gained access to her room without her permission, undressed her as she slept under the influence of

---

[1] Defendant's first jury trial ended in a hung jury.

[2] Defendant was also convicted of third-degree criminal sexual conduct (CSC-III), MCL 750.520d(1)(c), but the trial court vacated that conviction at sentencing.

-1-

alcohol, and penetrated her vaginally while she was still unconscious.

Surveillance footage from the restaurant showed that defendant was present during the same timeframe as the victim. Surveillance footage from outside the restaurant shows that shortly before the victim and her group left in a taxi, defendant went outside to the restaurant's rear parking lot, entered a car, drove to the front parking lot (where the taxi was waiting), backed into a parking space near the parking lot's exit, and turned off his car's headlights. He waited until the taxi pulled away, then turned on his headlights and followed immediately behind it.

Defendant was not a hotel customer on the evening in question. The hotel's surveillance footage showed that after following the victim and her coworkers into the hotel lobby, defendant wandered around for some time, seemingly without aim, with a cell phone pressed to his ear. Defendant remained at the hotel for approximately three hours. At times, he went up to the victim's floor and walked around. At one point, when hotel staff was not present, defendant leaned over the front desk in the hotel lobby, flipping through a rolodex of hotel guests. He also reached over and appeared to grab a keycard from behind the counter. Defendant subsequently conversed with the night manager. He told the manager that he was "concerned about" his girlfriend because she had been "ill." Defendant gave the manager her name and room number, and after verifying that a person with that name was staying in the given room, the manager called the room, but there was no answer. At defendant's insistence, the manager called a second time, but there was again no answer. After this, the manager saw defendant leave and continue to wander around with his cell phone pressed to his ear. The manager assumed that defendant was continuing to try to call his girlfriend.

According to the victim, when she retired to her room for the evening, she opened her room door using one of the two keycards that had been provided to her—both of which she retained in her possession—and entered. She assumed that the door would fully close and automatically lock behind her, so she did not engage either the deadbolt or the swing-bar latch. It was later discovered that the door to the victim's room would often close incompletely, such that its automatic locking mechanism would not latch. When this occurred, the door could be pushed open from the outside with minimal force.

The victim went to her bed and video chatted with her boyfriend. While the two were conversing, she heard someone knocking at her door and "a voice telling [her] to let him in." She looked out of her room's peephole, but did not see anyone. The same thing happened once or twice more while the victim was speaking with her boyfriend. After hanging up with her boyfriend, the victim looked out the peephole again, did not see anyone, and then got into bed. She had been sick all day and felt "a little bit" intoxicated. So, she left the bathroom door open and the bathroom light illuminated, and fell asleep fully dressed in leggings, a shirt, and underwear.

The victim's next memory was of waking up in the bed on her back and finding that her legs were spread, she was nude from the waist down, and there was "a man on top of [her]." The man's face was "right in front of" her, but aside from the fact that he was an "older" African-American male, she could not see any details that would permit her to identify him. The victim "didn't know what to think," "was in shock," and "just started crying."

During defendant's second jury trial, the victim was no longer able to specifically recall

whether the man on top of her was in any physical contact with her genitals or had penetrated her. She explained that, as a coping mechanism that she has learned in therapy, she has actively tried to "block . . . out" her memories of the sexual assault. However, she indicated that her memory had been clearer at both the preliminary examination and defendant's first jury trial. Over defendant's objection, the victim testified that at her preliminary examination, she had testified that the man on top of her had been "raping" her and that his penis had been inside of her "genital opening[.]" She also testified that her memory concerning penetration had been the same at defendant's first jury trial, as had her testimony.

The victim's "next memory was standing at the door telling him that he needed to go." She could not recall the man getting off of her or how she had gotten to the door. Ultimately, however, the man left, and the victim called her mother. According to the victim's mother, the victim was "crying hysterically," "moaning," and unable to speak coherently. Eventually, her mother was able to get her calmed down enough to answer some questions about what had happened. In "half sentences," the victim indicated that "a black man had broken into her room" and "hurt" her. After speaking with her mother and her grandmother, the victim went to the front desk and reported the incident, and the police were summoned.

A forensic examination of the victim was performed, which included the collection of swabs for DNA testing. During the examination, a nurse asked the victim whether the unknown man's penis had penetrated her vagina, the victim initially replied, "I think it did." But she then stated, "I'm pretty sure it did. 100% positive." Defendant's DNA matched the DNA collected from a swab taken from the victim's labia majora and neck.

The jury found defendant guilty of CSC-I and first-degree home invasion.[3] This appeal ensued.

## II. STANDARDS OF REVIEW

Defendant raises several claims of error on appeal, which we review under varying standards. "Whether defense counsel performed ineffectively is a mixed question of law and fact; this Court reviews for clear error the trial court's findings of fact and reviews de novo questions of constitutional law." *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). Preserved "[c]laims of instructional error are generally reviewed de novo by this Court, but the trial court's determination that a jury instruction is applicable to the facts of the case is reviewed for an abuse of discretion." *People v Dobek*, 274 Mich App 58, 82; 732 NW2d 546 (2007). We also review for an abuse of discretion a trial court's decision to remove a seated juror, *People v Unger*, 278 Mich App 210, 259; 749 NW2d 272 (2008), and to exercise statutory discretion to impose consecutive sentences, *People v Norfleet*, 317 Mich App 649, 654; 897 NW2d 195 (2016). "An

---

[3] The jury also found defendant guilty of third-degree criminal sexual conduct (CSC-III), MCL 750.520d(1)(c) (penetration and the victim was "mentally incapable, mentally incapacitated, or physically helpless"), but the trial court vacated that conviction (apparently on double jeopardy grounds) at sentencing.

abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *People v Bass*, 317 Mich App 241, 256; 893 NW2d 140 (2016) (quotation marks and citation omitted).

We review defendant's several unpreserved claims of error under the *Carines*[4] plain-error test, which "has four elements":

> 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) . . . the plain error affected substantial rights . . . [, and 4) ] once a defendant satisfies these three requirements, an appellate court must exercise its discretion in deciding whether to reverse. Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence. [*People v Randolph*, 502 Mich 1, 10; 917 NW2d 249 (2018), quoting *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999) (alterations and ellipses in *Randolph*).]

"A 'clear or obvious' error under the second prong is one that is not subject to reasonable dispute." *Randolph*, 502 Mich at 10. The third element "generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Carines*, 460 Mich at 763. "It is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice." *Id*. (quotation marks and citation omitted).

### III. ANALYSIS

Defendant raises several issues on appeal. Each is addressed in turn.

### A. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that his trial counsel performed ineffectively in a variety of ways, such that defendant is now entitled to a new trial. We disagree.

The "defendant has the burden of establishing the factual predicate for his claim of ineffective assistance of counsel. . . ." *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999). As this Court explained in *People v Lockett*, 295 Mich App 165, 187; 814 NW2d 295 (2012):

> Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise. To establish an ineffective assistance of counsel claim, a defendant must show that (1) counsel's performance was below an objective standard of reasonableness under prevailing professional norms and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. [Citations omitted.]

"A reasonable probability is a probability sufficient to undermine confidence in the outcome."

---

[4] *People v Carines*, 460 Mich 750; 597 NW2d 130 (1999).

*Strickland v Washington*, 466 US 668, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984). The "reasonable probability" standard can be satisfied by less than a preponderance of the evidence. *Trakhtenberg*, 493 Mich at 56.

The "reviewing court must not evaluate counsel's decisions with the benefit of hindsight," but should "ensure that counsel's actions provided the defendant with the modicum of representation" constitutionally required. *People v Grant*, 470 Mich 477, 485; 684 NW2d 686 (2004), citing *Strickland*, 466 US at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."). "Defense counsel is given wide discretion in matters of trial strategy because many calculated risks may be necessary in order to win difficult cases." *Unger*, 278 Mich App at 242. Thus, there is a "strong presumption that trial counsel's performance was strategic," and "[w]e will not substitute our judgment for that of counsel on matters of trial strategy[.]" *Id.* at 242-243. "Yet a court cannot insulate the review of counsel's performance by calling it trial strategy." *Trakhtenberg*, 493 Mich at 52. "The inquiry into whether counsel's performance was reasonable is an objective one and requires the reviewing court to determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *People v Vaughn*, 491 Mich 642, 670; 821 NW2d 288 (2012) (quotation marks and citation omitted). Accordingly, the reviewing court must consider the range of potential reasons that counsel might have had for acting as he or she did. *Id*.

## 1. PERFORMANCE DURING JURY SELECTION

During the prosecution's voir dire of the prospective jurors, the prosecutor indicated that this case had "garnered some media attention" and asked the potential jurors if they recalled viewing any of the media coverage. Ultimately, six of the prospective jurors did, and at least two of them indicated that they were uncertain whether they could be impartial based on the pretrial publicity to which they had been exposed. Defense counsel also briefly questioned the venire at times concerning pretrial publicity, as did the trial court. Neither the prosecution nor the defense challenged any of the jurors who had been exposed to pretrial publicity for cause. Collectively, however, the prosecution and defense used peremptory challenges to excuse all but one of the jurors who reported exposure to pretrial publicity. The sole exception was Juror #1, who was seated for trial. On the topic of media coverage, Juror #1 stated, "I heard about the case but I don't remember any details, I think I saw it on television." She further indicated that she had formed no opinions about the case based on pretrial publicity, believed that she could "be a fair and impartial juror in this matter," and thought that she would be able to "judge this case based solely on the evidence that[ was] presented in court[.]"

On appeal, defendant argues that counsel performed ineffectively by failing to perform a more thorough voir dire of the prospective jurors with regard to racial considerations and pretrial publicity, failing to object to the trial court's "superfluous" voir dire and the court-imposed time

limits on voir dire,[5] failing to request sequestration during voir dire, and by wasting peremptory challenges on potentially biased jurors instead of attempting to challenge them for cause. Defendant's arguments are unavailing.

Defendant's reliance on *United States v Cronic*, 466 US 648; 104 S Ct 2039; 80 L Ed 2d 657 (1984), is misplaced. Defendant contends that trial counsel's alleged failures during jury selection were so severe that they effectively deprived him of *any* assistance of counsel. Defendant further contends that jury selection is a "critical" stage of the proceedings and that, as such, counsel's poor performance constitutes the sort of structural error contemplated in *Cronic*. Thus, defendant argues, he is entitled to a *presumption* of prejudice and need not present any record evidence here to satisfy the second prong of the *Strickland* test for ineffective assistance (i.e., a reasonable probability of a different outcome but for counsel's deficient performance).

Defendant relies on a portion of *Cronic* in which the United States Supreme Court noted that there are "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified," the most notable of which is "the complete denial of counsel" "at a critical stage" of the proceedings. *Cronic*, 466 US at 658-659. The *Cronic* Court further noted that, in certain circumstances, "a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Id*. at 659-660.

As explained in *People v Lewis*, 501 Mich 1, 6-8; 903 NW2d 816 (2017), however, such statements in *Cronic* were hypothetical musings about situations not before the Court in that case, and thus they constituted dicta. Those statements of dictum were also "clearly incompatible" with the United States Supreme Court's earlier decision in *Coleman v Alabama*, 399 US 1; 90 S Ct 1999; 26 L Ed 2d 387 (1970), in which a majority of the Court, after deciding that a preliminary hearing was a "critical stage" of the proceedings, held that harmless-error review was appropriate despite the fact that the defendant had been deprived of counsel entirely at his preliminary hearing. *Lewis*, 501 Mich at 6-7. Because the relevant statements in *Cronic* were dicta, whereas the pertinent holding in *Coleman* was binding, our Supreme Court held that it was obliged to follow *Coleman* and hold that the deprivation of counsel at a critical pretrial proceeding "is subject to harmless-error review under the federal Constitution." *Lewis*, 501 Mich at 9.

Defendant offers no prejudice analysis, instead contending that under the *Strickland* test for ineffective assistance, he is entitled to a presumption that he was prejudiced by his counsel's alleged failures during jury selection. That argument runs directly contrary to the rule of law announced in *Lewis*, and thus, we reject it. See *People v Crockran*, 292 Mich App 253, 256-257; 808 NW2d 499 (2011) ("[O]nly the Supreme Court has the authority to overrule its own decisions. Until it does so, all lower courts and tribunals are bound by that prior decision and must follow it") (quotation marks and citations omitted).

Indeed, we perceive defendant's reliance on *Cronic* as a tacit admission that he cannot

---

[5] Defendant presents no record evidence indicating *what* time limits, exactly, were imposed by the trial court. The record indicates that jury selection in this case lasted approximately 2 hours and 45 minutes.

-6-

demonstrate prejudice on this record, and we agree he has failed to do so. He has presented no record evidence demonstrating a reasonable probability that, but for counsel's allegedly deficient performance during jury selection, the outcome of the trial would have differed. Defendant presents no evidence that any of the empaneled jurors were actually biased on grounds of race or pretrial publicity. Absent such evidence, defendant cannot carry his burden under the second prong of *Strickland*.

Moreover, with regard to the first prong of the *Strickland* test, defendant has failed to rebut the strong presumption that his trial counsel employed effective trial strategy during jury selection. Because of the inherently subjective nature of jury selection, which is more art than science, this Court ordinarily refrains from second-guessing counsel's decisions concerning prospective jurors. See, e.g., *Unger*, 278 Mich App at 258. "Perhaps the most important criteria in selecting a jury include a potential juror's facial expressions, body language, and manner of answering questions. However, as a reviewing court, we 'cannot see the jurors or listen to their answers to voir dire questions.' " *Id*. (citation omitted), quoting *People v Robinson*, 154 Mich App 92, 94; 397 NW2d 229 (1986). "Of all the important communications between human beings, at least 50% is nonverbal." *Robinson*, 154 Mich App at 95 (quotation marks and citation omitted). "A lawyer's hunches, based on his observations, may be as valid as any method of choosing a jury. Defense counsel may want to retain certain prospective jurors, especially, and be willing to express satisfaction so the prosecution will not or cannot eliminate them." *Id*. Moreover, counsel may be rightfully concerned that, should he unsuccessfully challenge a juror for cause, "that unsuccessful challenge[] . . . would not be viewed favorably by the jury." *Id*. at 94. Hence, as this Court observed in *Robinson*, "[o]ur research has found no case in Michigan where defense counsel's failure to challenge a juror or jurors has been held to be ineffective assistance of counsel. We cannot imagine a case where a court would so hold[.]" *Id*. at 95. This case does not present any exception to that well-founded rule.

## 2. THE DEFENSE'S OPENING STATEMENT

Defendant argues that trial counsel performed ineffectively by making the following remarks during opening statement:

> We also expect the evidence to show that Mr. Parkman [i.e., defendant] is an individual who hangs out at this, um, Wheat & Rye Restaurant. Um, he's familiar with the, the owner. Or not the owner, but some of the workers. He's familiar with the manager. Um, he goes to that establishment to sell drugs.

> You'll see from one of these videos that he's in back of the bar with another individual smoking a joint.

> You'll see that, um, Mr. Parkman is familiar with that establishment. He's familiar with the, um, the hotel.

When questioned about those comments at the *Ginther*[6] hearing, counsel explained that he made

---

[6] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

them because they reflected the testimony that counsel anticipated at trial, and because they allowed the defense a theory to explain why defendant was at the hotel on the night in question. Specifically, based on what defendant had told counsel, counsel expected that the restaurant's manager would testify that defendant sold drugs at the bar. Using that anticipated testimony, defense counsel planned to argue that defendant went to the hotel on the night in question to sell narcotics, not to sexually assault the victim. At trial, however, when the prosecution aggressively questioned the manager about whether defendant had sold drugs out of the restaurant, the manager denied any knowledge that defendant had ever committed any illegal activity on the premises. Therefore, defense counsel abandoned the drug-dealer theory.

In light of the compelling evidence against defendant, defendant has failed to rebut the strong presumption that his trial counsel's chosen strategy was effective. Based on the hotel's surveillance footage, defense counsel was put in the difficult position of explaining why defendant—who was not a guest at the hotel—spent several hours there during the middle of the night, wandering around with a cell phone pressed to his ear. In light of the surveillance footage from the restaurant, which showed defendant closely associating with a man who is openly smoking something that appears to be marijuana, and also showed numerous people approach defendant throughout the evening, it could be plausibly argued that defendant's conduct was consistent with that of a drug dealer, and this activity would also explain defendant's presence at the hotel. Under the circumstances, a competent trial attorney might well decide to take that approach to explain defendant's overnight presence at the hotel—despite the negative character inferences that the jury might draw. We will not second-guess this strategy with the benefit of hindsight.

### 3. FAILURE TO REQUEST AN INSTRUCTION ON A NECESSARILY INCLUDED LESSER OFFENSE

Defendant argues that trial counsel performed ineffectively by failing to request an instruction regarding misdemeanor entering without permission, MCL 750.115, which is a lesser included offense of felony home invasion.[7] We are unpersuaded.

At the *Ginther* hearing, counsel explained that his strategy had been to focus the defense on the CSC charges and on his client's actual innocence—i.e., on the fact that defendant denied ever having been in the victim's hotel room in the first instance. In light of the defense theory of the case, counsel's failure to request a lesser-offense instruction was a reasonable strategy. Had the jury been instructed regarding misdemeanor entering without permission as a lesser included lesser offense of first-degree home invasion, to argue effectively in favor of that lesser charge, defense counsel would have been forced to concede that defendant did, in fact, enter the victim's room. Given that the evidence at trial provided no noncriminal motive for defendant to enter the victim's room, it was altogether reasonable for counsel to focus the defense on disputing that defendant had entered the victim's room at all. Moreover, counsel might have reasonably decided

---

[7] Misdemeanor entering without permission is a lesser included offense of first-degree home invasion. *People v Wilder*, 485 Mich 35, 41; 780 NW2d 265 (2010); *People v Silver*, 466 Mich 386, 392; 646 NW2d 150 (2002).

that it was better to force the prosecution to prove the elements of first-degree home invasion beyond a reasonable doubt—or face acquittal on that charge—rather than affording the jury the opportunity to convict defendant of a lesser charge if it was unconvinced concerning first-degree home invasion.

In any event, defendant's instant claim of ineffective assistance is fatally flawed because he has failed to establish a reasonable probability of a different outcome but for counsel's failure to request the disputed instruction. Jurors are presumed to follow their instructions, *People v Graves*, 458 Mich 476, 486-487; 581 NW2d 229 (1998), and in this case, after the jury was instructed concerning the elements of the charged offenses and the prosecution's burden of proof, it found defendant guilty of first-degree home invasion, CSC-I, and CSC-III. Defendant has presented no record evidence demonstrating a reasonable probability that the jury would instead have found him guilty of misdemeanor entry without permission had it been given that option.

### 4. FAILURE TO MOVE FOR A DIRECTED VERDICT AS TO CSC-III

Defendant argues that trial counsel performed ineffectively by failing to move for a directed verdict with regard to the CSC-III charge. However, defendant acknowledges that the trial court vacated his conviction of CSC-III at sentencing. Therefore, defendant's instant claim of ineffective assistance of counsel necessarily fails. He cannot demonstrate that he suffered any prejudice as a result of his counsel's failure to move for a directed verdict concerning CSC-III.

### 5. FAILURE TO INVESTIGATE CELL PHONE RECORDS

At the *Ginther* hearing, defendant's trial counsel testified that either before or during defendant's second trial, defendant's sister informed counsel that defendant had a second cell phone that was registered under an alias. Counsel "delved into it" and spoke with defendant about the matter, and defendant indicated that he had used the cell phone in question to make calls from the hotel on the evening of the victim's assault. But defendant "was unable to provide [counsel] with phone numbers . . . or contact numbers" for the people with whom he claimed that he had spoken on the evening of the offense.

On appeal, defendant argues that trial counsel performed ineffectively by failing to investigate the cell phone records. However, assuming, without deciding, that counsel should have investigated them, defendant nevertheless is not entitled to relief here. Defendant concedes that the disputed records "have now been purged and there is no way of determining what they would have established." In other words, defendant admittedly has no way of demonstrating that counsel's further investigation into the cell phone records would have yielded any favorable evidence. Therefore, defendant cannot carry his burden of demonstrating a reasonable probability that, but for counsel's allegedly deficient performance in this respect, the result of his trial would have been different.

## B. JURY SELECTION

Defendant argues that the trial court plainly erred[8] by placing an "arbitrary time restriction" on jury voir dire and failing to sua sponte take steps to ensure that the pretrial publicity had not infected the jury pool with bias. Defendant relies on *People v Tyburski*, 445 Mich 606, 631; 518 NW2d 441 (1994) (opinion of MALLETT, J.) ("A juror's self-assessment of bias should not be accepted without first eliciting information concerning the content and extent of the juror's exposure to publicity so that the court can make its own determination of the juror's impartiality. While it is within the trial court's discretion to select the method for eliciting such information, it is an abuse of discretion to abdicate this responsibility."), and *People v Jendrzejewski*, 455 Mich 495, 509; 566 NW2d 530 (1997) ("[W]here there is extensive pretrial publicity, jurors should be adequately questioned so that challenges for cause and preemptory challenges can be intelligently exercised.").

There is no plain error justifying reversal. To begin with, while contending that the trial court imposed "arbitrary" time limits on jury voir dire, defendant presents no record evidence indicating *what* time limits, exactly, were imposed. Rather, defendant merely notes that at one point, the trial court asked whether the prosecution would like "a five-minute warning," and later, when the defense was questioning a prospective juror, the court interjected briefly, stating: "Five minutes." However, the record indicates that jury selection in this case lasted approximately 2 hours and 45 minutes. Moreover, the members of the venire were repeatedly asked about their exposure to pretrial publicity. Hence, we detect nothing plainly erroneous about the temporal scope of the voir dire that was conducted below.

Furthermore, as defendant acknowledges, only six members of the venire reported any exposure to pretrial publicity, with just two of them indicating that exposure to such publicity had biased them one way or the other. And only one juror with any degree of exposure to pretrial publicity—Juror #1—was seated on the jury for trial. This is a far cry from the level of pretrial publicity that was at issue in *Tyburski*, 445 Mich at 612 n 1, where "[a]ll but two of the thirty-seven potential jurors . . . acknowledged exposure to the media coverage," and "[o]f the twelve jurors who decided the case, all but one acknowledged such exposure." Rather, the pretrial publicity at issue here resembles the less sweeping media coverage that was at issue in *Jendrzejewski*, 455 Mich at 503 ("The record reveals that while there was some limited television and radio coverage identifying the crime, the victims, and the defendant, the jury voir dire established that very few jurors had any discernable recall of what they had seen or heard on these broadcasts."). This militates against a finding of plain error here. See *id*. at 508-510; *People v Sawyer*, 215 Mich App 183, 190; 545 NW2d 6 (1996) ("While understanding *Tyburski* to impose an additional measure of caution upon the trial court in all cases potentially infected by pretrial publicity, to whatever degree, we are not persuaded by the record that the instant case more greatly resembles *Tyburski* than it does a normal criminal case in terms of the prophylactic measures that need to be undertaken by the court. . . . In the instant case, a far lower percentage of prospective

---

[8] Because defendant did not object to the jury-selection process before the selected jury was empaneled and sworn, his instant claim of error is unpreserved and subject to plain-error review. See *People v Taylor*, 275 Mich App 177, 184; 737 NW2d 790 (2007).

and actual jurors acknowledged similar exposure [to pretrial publicity].").

In addition, "contrary to defendant's assertion, there is no right to any specific procedure for engaging in voir dire. There is simply a right to a jury whose fairness and impartiality are assured by procedures generally within the discretion of the trial court." *Sawyer*, 215 Mich App at 191, discussing *Tyburski*, 445 Mich at 619. Defendant takes issue with the manner in which the trial court conducted jury selection, but he presents no record evidence indicating that the seated jurors were actually biased as a result of their exposure to pretrial publicity. On the contrary, the record evidence establishes that Juror #1 reported no meaningful recall of the pretrial publicity. In the end, defendant merely speculates that other jurors *might* have been biased or *might* have been exposed to more pretrial publicity than they admitted. Consequently, defendant is not entitled to appellate relief under the plain-error test. He has failed to carry his burden of demonstrating that the trial court's purported plain error was outcome-determinative or that it resulted in an unfair trial before a jury that had been tainted by pretrial publicity.

## C. HEARSAY

Defendant argues that the trial court abused its discretion by admitting testimony concerning penetration—given by the victim at the preliminary examination—as substantive evidence during the second trial.[9] Specifically, defendant argues that such testimony constituted hearsay that was inadmissible under the "declarant unavailable" exception set forth by MRE 804(b)(1). Because defendant raised no hearsay objection below—raising only a general objection that the disputed testimony seemed "improper"—this issue is unpreserved, and we review it for plain error. See *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001) ("To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal."). We find no error.

In pertinent part, MRE 804 provides:

> (a) Definition of Unavailability. "Unavailability as a witness" includes situations in which the declarant—

---

[9] Defendant also contends that the trial court erroneously admitted the victim's testimony from defendant's first trial as substantive evidence at the second trial. This claim of error is belied by the record. The victim's actual *statements* at the first trial were not admitted into evidence at the second trial; rather, she was merely asked whether she had remembered defendant penetrating her at that time and given testimony to that effect. Hence, no hearsay from the first trial was introduced. See MRE 801(a) ("A 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion."); MRE 801(c) (" 'Hearsay' is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."); *People v Jones (On Rehearing After Remand)*, 228 Mich App 191, 207; 579 NW2d 82 (1998), mod in part on other grounds 458 Mich 862 (1998) (rejecting the "implied assertion" hearsay theory, under which words need not contain an express assertion to qualify as an assertive "statement" for hearsay purposes).

-11-

\* \* \*

(3) has a lack of memory of the subject matter of the declarant's statement[.]

\* \* \*

(b) Hearsay Exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(1) Former Testimony. Testimony given as a witness at another hearing of the same or a different proceeding, if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

Similarly, MCL 768.26 provides:

Testimony taken at an examination, preliminary hearing, or at a former trial of the case, or taken by deposition at the instance of the defendant, may be used by the prosecution whenever the witness giving such testimony can not, for any reason, be produced at the trial, or whenever the witness has, since giving such testimony become insane or otherwise mentally incapacitated to testify.

As defendant acknowledges, there is a great deal of caselaw—both binding and persuasive—that supports the proposition that a witness is "unavailable" for purposes of MRE 804(b)(1) if that witness gave sworn testimony at a former hearing and, at the time of trial, he or she no longer remembers the subject matter of such testimony. See, e.g., *People v Farquharson*, 274 Mich App 268, 276-277; 731 NW2d 797 (2007); *People v Chavies*, 234 Mich App 274, 284; 593 NW2d 655 (1999), overruled in part on other grounds by *People v Williams*, 475 Mich 245 (2006); *People v Williams*, 117 Mich App 505, 510; 324 NW2d 70 (1982); *People v Patton*, 66 Mich App 118, 121; 238 NW2d 545 (1975) (holding that lack of memory is sufficient for admissibility under MCL 768.26). Moreover, if the declarant is actually "present at trial and subject to unrestricted cross-examination," no Confrontation Clause concerns arise out of the introduction of the declarant's former testimony. *United States v Owens*, 484 US 554, 560; 108 S Ct 838; 98 L Ed 2d 951 (1988). Defendant does not contend that the trial court clearly erred when it tacitly found that the victim could not, at trial, recall the subject matter of her former testimony concerning penetration. Thus, we find no plain error in the trial court's determination that she was an "unavailable" witness for purposes of MRE 804(b)(1).

Nor do we perceive any plain error in the trial court's determination that the victim's former testimony concerning penetration was substantively admissible under MRE 804(b)(1). At the preliminary examination, defense counsel was afforded an ample opportunity to cross-examine the victim concerning her testimony that she had woken up in her hotel room with an unknown man on top of her, whose "penis" had been "inside" of her "genital opening." And given that defendant's felony information had given him notice that he was charged with CSC-I for having penetrated the victim during circumstances involving the commission of first-degree home invasion, the defense certainly had a "similar motive" to develop the victim's testimony concerning penetration at the preliminary examination. See *Farquharson*, 274 Mich App at 278.

Thus, we conclude that the trial court committed no plain error by admitting the victim's disputed former testimony under MRE 804(b)(1).[10]

## D. JURY INSTRUCTIONS

Defendant argues that the trial court erroneously instructed the jury on several points. Although we agree that some of the trial court's modifications to the model jury instructions were ill-advised, we find no plain error warranting reversal.

To preserve claims of instructional error like those at issue here, a defendant must object to the provided instructions before the jury retires to deliberate. See *People v Gonzalez*, 256 Mich App 212, 225; 663 NW2d 499 (2003); *People v Sabin (On Second Remand)*, 242 Mich App 656, 657; 620 NW2d 19 (2000). Before the jury deliberated, defense counsel specifically objected to the prosecution's proposed instruction that the labia majora represents the beginning of the female "genital opening" for purposes of CSC-I. Hence, defendant's related claim of instructional error is preserved. However, defendant raised no other timely objections to the jury instructions provided below. Thus, his other claims of instructional error are unpreserved and reviewed for plain error affecting his substantial rights. See *People v Knapp*, 244 Mich App 361, 375; 624 NW2d 227 (2001).

Over defendant's objection, the trial court instructed the jury that for purposes of both CSC-I and CSC-III, the phrase "genital opening" "includes the inside of the labia majora." Defendant argues that this instruction was erroneous. We disagree.

For these purposes, "sexual penetration" is statutorily defined, in pertinent part, as "sexual intercourse . . . or any other intrusion, *however slight*, of *any part of a person's body or of any object into the genital or anal openings of another person's body*, but emission of semen is not required." MCL 750.520a (emphasis added). Hence, "*any* intrusion, however slight, into the vagina *or* the labia majora" constitutes sexual penetration for purposes of CSC-I. *Lockett*, 295 Mich App at 188, citing *People v Whitfield*, 425 Mich 116, 135 n 20; 388 NW2d 206 (1986). Because it is well-established that "[t]he labia are included in the 'genital openings' of the female," *People v Legg*, 197 Mich App 131, 133; 494 NW2d 797 (1992), defendant's instant claim of instructional error is unfounded.

With regard to the first-degree home invasion charge, defendant argues that the trial court erroneously instructed the jury concerning the intent element. Specifically, defendant notes that the trial court instructed that when defendant entered the victim's hotel room, it must have been "his intent to commit a felony or an assault," whereas defendant's felony information indicated that defendant was charged with first-degree home invasion for having actually *committed* CSC-I or CSC-III against the victim while he was in her hotel room, not for merely having entered

---

[10] Moreover, in light of the DNA evidence against defendant and the nurse-examiner's testimony concerning the victim's statements describing penetration during her rape-kit examination (the admissibility of which defendant does not contest), defendant cannot carry his burden of demonstrating that the alleged hearsay error was outcome-determinative.

*intending* to do so.[11]  We perceive no plain instructional error warranting reversal.

"Grounded in a defendant's constitutional right of due process of law is the principle that an accused shall not be called upon to defend himself against a charge of which he was not sufficiently apprised."  *People v Higuera*, 244 Mich App 429, 442; 625 NW2d 444 (2001) (quotation marks, citations, and brackets omitted).  Moreover, MCL 767.45(1) provides that a criminal information "shall contain," among other things, "[t]he nature of the offense stated in language which will fairly apprise the accused and the court of the offense charged."  However, as explained in *People v Stricklin*, 162 Mich App 623, 633; 413 NW2d 457 (1987), under MCL 767.76,

> [a]n information may be amended at any time before, during, or after trial to cure any defect, imperfection, or omission in form or substance, including a variance between the information and the proofs, as long as the accused is not prejudiced by the amendment and the amendment does not charge a new crime.

Accord *Higuera*, 244 Mich App at 444.  A defendant is prejudiced by amendment of the information "when the defendant does not admit guilt and is not given a chance to defend against the crime."  *Stricklin*, 162 Mich App at 633.

In this instance, to the extent that the trial court instructed the jury regarding first-degree home invasion under a theory that was not specified in the felony information, defendant cannot demonstrate any prejudice to his substantial rights on that basis.  Because the jury found defendant guilty of having actually *committed* CSC-I, defendant cannot demonstrate that he would have been acquitted of first-degree home invasion had the trial court given the instruction that he now claims it should have.  Furthermore, if defendant had objected and called this instructional matter to the trial court's attention, the court could have cured its purported mistake by simply permitting the prosecution to amend the felony information accordingly.  In particular, because the original felony information specifically cited MCL 750.110a(2) in support of the first-degree home invasion charge, defendant was afforded sufficient notice of the charge against him and its elements to be able to defend against it.  See *Higuera*, 244 Mich App at 447; *People v Covington*, 132 Mich App 79, 86; 346 NW2d 903 (1984) ("A defendant is not prejudiced by an amendment to the information to cure a defect in the offense charged where the original information was sufficient to inform the defendant and the court of the nature of the charge.").  Because defendant suffered no prejudice from the court's alleged instructional error concerning first-degree home invasion, we reject his claim of error under the *Carines* test.

Defendant next contends that the trial court plainly erred by adding certain words to M

---

[11]  Under MCL 750.110a(2), a person commits the crime of first-degree home invasion by "break[ing] and enter[ing] a dwelling with intent to commit a felony, larceny, or assault in the dwelling, . . . enter[ing] a dwelling without permission with intent to commit a felony, larceny, or assault in the dwelling, *or* . . . break[ing] and enter[ing] a dwelling or enter[ing] a dwelling without permission and, at any time while he or she is entering, present in, or exiting the dwelling, commits a felony, larceny, or assault . . . ."  [Emphasis added.]

Crim JI 5.2—including the phrase "or not"—as follows:

> And you should not decide this case based on which side presented more evidence or more witnesses. Instead, you should think about each witness and each piece of evidence and whether you believe them. And then you must decide whether the testimony and the evidence that you believe prove beyond a reasonable doubt that the defendant is guilty *or not*. [Emphasis added.]

We agree with defendant that the trial court erred, and did so plainly, by altering the wording of M Crim JI 5.2. "A criminal defendant is entitled to have a properly instructed jury consider the evidence against him." *People v Riddle*, 467 Mich 116, 124; 649 NW2d 30 (2002). "Further, MCR 2.512(D)(2) requires that the jury be instructed using the Michigan Model Criminal Jury Instructions if '(a) they are applicable, (b) they accurately state the applicable law, and (c) they are requested by a party.' " *People v Rosa*, 322 Mich App 726, 739; 913 NW2d 392 (2018). By adding the phrase "or not" where it did in M Crim JI 5.2, the trial court inadvertently suggested that the jury was charged with deciding whether it had been proven beyond a reasonable doubt that defendant was—or was *not*—guilty. That suggestion is fundamentally incompatible with the presumption of innocence. See *People v Beck*, ___ Mich ___, ___; ___ NW2d ___ (2019) (Docket No. 152934), cert pending; slip op at 13 ("A defendant is entitled to a presumption of innocence as to all charged conduct until proven guilty beyond a reasonable doubt, and that presumption is supposed to do meaningful constitutional work as long as it applies. At least that's what we tell the accused and the jury about how it works.") (footnotes omitted). Rather than ad-libbing, the trial court should have read M Crim JI 5.2 to the jury as it is written.

Even so, we conclude that defendant's instant claim of instructional error fails under the third prong of the *Carines* test. "When this Court reviews jury instructions for reversible error, we consider the instructions as a whole," *People v Richardson*, 490 Mich 115, 119; 803 NW2d 302 (2011), and "an imperfect instruction is not grounds for setting aside a conviction if the instruction fairly presented the issues to be tried and adequately protected the defendant's rights," *People v Kowalski*, 489 Mich 488, 501-502; 803 NW2d 200 (2011). Moreover, the trial court instructed the jury that defendant was presumed to be innocent and that "this presumption continue[d] throughout the trial and entitle[d] the defendant to a verdict of not guilty unless or until [the jury was] satisfied beyond a reasonable doubt that he [wa]s guilty." Viewing the instructions cumulatively, they were sufficient to safeguard defendant's presumption of innocence. Hence, defendant has failed to demonstrate that this instructional error prejudiced his substantial rights.

Defendant's final claim of instructional error regards the model instruction concerning circumstantial evidence, M Crim JI 4.3. He argues that the trial court plainly erred by altering the language of M Crim JI 4.3 as follows:

> But facts can also be proven by indirect or what we call circumstantial evidence. And circumstantial evidence is simply evidence that normally or reasonably leads to *certain inevitable conclusions*. So, for example, maybe you don't actually see it raining outside but you see someone walk in the courtroom wearing a raincoat carrying an umbrella covered with small drops of water. Well, that is circumstantial evidence that it's raining outside.

And you may consider circumstantial evidence. *There's nothing wrong with it.* Circumstantial evidence by itself, or together with direct evidence can be used to prove a crime. [Emphasis added.]

To the extent that defendant complains about the trial court's comment that there is "nothing wrong with" circumstantial evidence, we find his argument meritless. The trial court stated the law correctly. There is, in fact, nothing wrong with circumstantial evidence. See *People v Hardiman*, 466 Mich 417, 429 n 7; 646 NW2d 158 (2002) ("circumstantial evidence is oftentimes stronger and more satisfactory than direct evidence") (quotation marks and citation omitted).

We agree that the trial court plainly erred by changing the language of M Crim JI 4.3(3) to define circumstantial evidence as evidence "that normally or reasonably leads to certain inevitable conclusions." We are aware of no authority supporting the proposition that circumstantial evidence is evidence that normally or reasonably leads to "inevitable conclusions." Indeed, such a definition of circumstantial evidence would seem to be far too restrictive. Circumstantial evidence has been broadly defined as "[e]vidence based on inference and not on personal knowledge or observation" or "[a]ll evidence that is not given by eyewitness testimony." *Black's Law Dictionary* (11th ed 2019). However, viewing this instruction in the context of the instructions as a cohesive whole, defendant cannot demonstrate any prejudice from the trial court's error. Given that the trial court properly instructed the jury with the classic raincoat-and-umbrella example of circumstantial evidence, the jury was fairly instructed on the subject. That commonsense example was sufficient to properly explain the concept of circumstantial evidence to the jurors. And in any event, in light of the strong nature of the direct and circumstantial proofs against defendant, he cannot demonstrate that any of the alleged instructional errors were outcome-determinative.

## E. REMOVAL OF A SEATED JUROR

Defendant argues that the trial court abused its discretion by discharging Juror #12—who was one of two African-Americans on the seated jury—for purportedly attempting to have out-of-court contact with the prosecution. We disagree.

On the sixth day of trial, the prosecution informed the trial court that, during a recess, "Juror #12" had gotten onto an upward-bound elevator with two victim advocates, followed them to the Prosecutor's Office, and tried to gain entry to that office through a "private entrance." The trial court summoned Juror #12 before the court and questioned him about the matter in the following exchange:

*Q.* Um, . . . I've received some information, . . . that . . . causes me to pull you out and ask you some questions about, um, your actions after we took our lunch break.

Um, you apparently found yourself going up to the 11th floor, the Prosecutor's Office.

*A.* No. I was trying to—uh, I couldn't catch an elevator so I—what I was trying to do was go up and then the stairs, but I couldn't. It wasn't no stairs so I

-16-

had to get back on the elevator.

* * *

*Q.* When you got off the elevator where did you go?

*A.* When I got off the ele—when I got off the elevator on the 11th floor.

*Q.* Why did you ride up to the 11th floor[?]

*A.* Because I was tryna, tryna [sic] find another to elevator go down.

*Q.* Well, that elevator would go down eventually, wouldn't it?

*A.* I mean I couldn't catch one because everybody—it was full, so I was just—

*Q.* Well, the one you were on would've gone down.

*A.* Yeah. I, I tried to walk down the stairs. That's why.

*Q.* You got off the elevator on the 11th floor in order to get an elevator to go down; is that what you're saying?

*A.* I was tryna [sic] take the stairs, so.

*Q.* Why would you wanna walk down 11th flights [sic] if you could of—

*A.* I—

*Q.* —just stayed on the elevator?

*A.* Yeah, I—

*Q.* You can't explain that.

*A.* Yeah, I was just rushing.

*Q.* Well, when you got off the elevator then where did you go?

*A.* When I got off the elevator, I went back down, uh, first floor.

*Q.* Before you went down, where did you go when you got off the elevator?

*A.* I tried to look for the stairs to go back downstairs, but I didn't see no stairs to go walk, go downstairs, so I—

* * *

-17-

*Q.* Did you follow some people to a door[?]

*A.* It's I mean I thought it was the stairs to go back downstairs, but they, you know, told me I had to go back that way. So I, I went with the intention of looking for the stairs. So I got back on the elevator and went down. So it was just a miss, you know.

*Q.* Well, did you realize you were in the Prosecutor's Office when you got off the elevator?

*A.* Oh, no. No.

*Q.* Um, there are a few people involved in this case who said you followed them to a private entrance into the Prosecutor's Office and tried to get through that entrance.

*A.* No, I mean because I though[t] it was—that was way for the, the stairs. I didn't know it was the Prosecutor's Office.

*Q.* And you didn't know who you were following?

*A.* No, I was trying to take—find the stairs.

*Q.* I know what you were trying to do.

My question to you was did you not know who you were following to the doorway?

*A.* No, I wasn't tryna follow no—I wasn't tryna [sic] follow nobody, your Honor.

*Q.* Well there were some people ahead of you, right?

*A.* Yeah, it was people ahead of me.

*Q.* You thought they were going to a stairway?

*A.* Yeah. I thought, I though[t] the stairway to go back downstairs was that way, so.

\* \* \*

*Q.* Um, did you talk to any of the other jurors about your misadventure upstairs on the 11th floor?

*A.* No.

Thereafter, one victim advocate testified that during the incident in question, she had specifically held the door of a downward-bound elevator for Juror #12, but he had not entered it

-18-

despite the fact that there had been space for him. Instead, he had waited and followed her and another victim advocate from the trial onto an "up" elevator. He subsequently followed them off of that elevator and followed the victim advocate to a locked entry into the prosecutor's office, which she opened with a key. Juror #12 "came up behind" the victim advocate and she opened the door and stepped through, then quickly shut the door behind her to deny Juror #12 entry. Likewise, the other victim advocate testified that Juror #12 "had two opportunities to get on the elevator, whether it was up . . . or down," but he had instead waited and gotten onto an elevator with the two victim advocates, seemingly as if he specifically wanted to board the same elevator.

After hearing this testimony, the trial court removed Juror #12 over defendant's continued objection. As a result, the number of seated jurors was reduced from 14 to 13. The trial court reasoned that the situation was "bizarre," noted that it was troubled that Juror #12 had provided an "implausible explanation" for his actions, and observed that there seemed to be "something wrong with him" that rendered him "unfit to sit through th[e] trial."

Defendant argues that the trial court abused its discretion by so ruling. In light of the trial court's credibility determinations, we disagree.

In pertinent part, MCL 768.18 provides:

Should any condition arise during the trial of the cause which in the opinion of the trial court justifies the excusal of any of the jurors so impaneled from further service, he may do so and the trial shall proceed, unless the number of jurors be reduced to less than 12.

"[I]f resolution of a disputed factual question turns on the credibility of witnesses or the weight of the evidence, we will defer to the trial court, which had a superior opportunity to evaluate these matters." *People v Sexton*, 461 Mich 746, 752; 609 NW2d 822 (2000) (quotation marks and citation omitted). See also *People v Schepps*, 231 Mich 260, 269; 203 NW 882 (1925) (noting that because trial judges are, in situations such as these, personally able to observe a juror's "appearance and attitude, tone of voice, and manner of testifying," they are best situated to determine whether a juror remains competent to serve). In this instance, the trial court found that Juror #12 had engaged in "bizarre" behavior and had either intentionally lied to the court about his motivations or was unable to explain himself as a result of some sort of disability or general incompetence. We see no basis to disturb those factual findings, and in light of them, we conclude that the trial court's decision to remove Juror #12 fell well within the range of reasonable and principled outcomes.

## F. JUDICIAL COMMENTS

Defendant argues that the trial court made certain comments in the presence of the jury that pierced the veil of judicial impartiality, thereby depriving him of his due process right to a fair trial. Defendant admittedly raised no objection to the judicial comments about which he now complains on appeal. Therefore, this issue is unpreserved and our review is limited to plain error affecting defendant's substantial rights. *People v Jackson*, 292 Mich App 583, 597; 808 NW2d 541 (2011). We find no plain error warranting reversal.

On the fourth day of trial, while the defense was cross-examining the hotel's general manager about ladders that are stored outside on the hotel property, the following exchange occurred:

> *Q*.  You have ladders hanging out in, in the back lot of the, the hotel, right?
>
> *A*.  We, we had a ladder by the shed, correct.
>
> *  *  *
>
> *Q*.  Right.  You, you still have it there, right?
>
> *A*.  I believe so
>
> *Q*.  Okay. And you have a ladder on the ground next to the shed?
>
> *A*.  I, I believe it, it may still be there if it's in use.  I'm not exactly certain if it's there at this moment right now. . . .
>
> *  *  *
>
> *Q*.  Okay. So you don't know if it's locked or unlocked, if it's there or not, right?
>
> *A*.  I know that if it's being used, it's accessible and if it's not being used, it's not.
>
> *Q*.  Okay.  Well, I'm gonna [sic] show you some—

One of the trial prosecutors interjected, stating that he could see that defense counsel was intending to show the witness pictures that had been taken at the hotel "a couple of days" earlier.  The prosecutor seemingly began to argue that the photos were not relevant, but the trial court interrupted, leading to the following exchange:

> *THE COURT*:  What difference does it make whether there's a ladder out in the back of the hotel?
>
> I mean what is it supposed to show, your client's innocence or something?
>
> *[DEFENSE COUNSEL]*:  Yes, Judge.
>
> *THE COURT*:  Really?
>
> *[DEFENSE COUNSEL]*:  I have—
>
> *THE COURT*:  How.
>
> *[DEFENSE COUNSEL]*:  —no further questions, Judge.

-20-

*THE COURT*:  All right.

Defendant argues that the trial court's comments pierced the veil of judicial impartiality.

"A defendant claiming judicial bias must overcome a heavy presumption of judicial impartiality." *Jackson*, 292 Mich App at 598 (quotation marks and citation omitted).  "Judicial misconduct may come in myriad forms, including belittling of counsel, inappropriate questioning of witnesses, providing improper strategic advice to a particular side, biased commentary in front of the jury, or a variety of other inappropriate actions." *People v Stevens*, 498 Mich 162, 172-173; 869 NW2d 233 (2015).  "A trial judge's conduct deprives a party of a fair trial if a trial judge's conduct pierces the veil of judicial impartiality," and this occurs "when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party." *Id*. at 170.

> In evaluating the totality of the circumstances, the reviewing court should inquire into a variety of factors, including the nature of the judicial conduct, the tone and demeanor of the trial judge, the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, the extent to which the judge's conduct was directed at one side more than the other, and the presence of any curative instructions. . . . Reviewing courts may consider additional factors if they are relevant to the determination of partiality in a particular case. [*Id*. at 172.]

This "fact-specific" inquiry must be examined on a case-by-case basis.  *Id*. at 171.  "A single inappropriate act does not necessarily give the appearance of advocacy or partiality, but a single instance of misconduct may be so egregious that it pierces the veil of impartiality." *Id*.

Viewed within the totality of the circumstances, the trial court's disputed remarks were not so egregious as to pierce the veil of judicial impartiality.  The judicial comments in question spanned one brief moment of a seven-day jury trial, and after a thorough review of the transcripts, we conclude that the trial court's overall tone and demeanor toward the parties at trial was evenhanded.  Moreover, any perceived prejudice to defendant from the trial court's brief remarks was dissipated when the trial court subsequently instructed the jury that it was to decide the case based solely on the evidence, that the court's "comments, rulings, [and] questions" were not evidence, that such comments were not intended to convey the court's "personal opinion about the case," and that if the jurors believed that the court had such an opinion, they should "pay no attention to that opinion."  Hence, we reject defendant's contention that the court's disputed comments constituted outcome-determinative plain error.

## G.  CONSECUTIVE SENTENCING

Next, defendant argues that the trial court abused its discretion by imposing consecutive sentences without stating any reasoning in support of that decision on the record.  We agree.

"In Michigan, concurrent sentencing is the norm, and a consecutive sentence may be imposed only if specifically authorized by statute." *People v Ryan*, 295 Mich App 388, 401; 819 NW2d 55 (2012) (quotation marks and citation omitted).  In this case, the trial court was authorized

by the first-degree home invasion statute and the CSC-I statute to impose consecutive sentences. MCL 750.110a(8); MCL 750.520b(3).

"[T]rial courts imposing one or more discretionary consecutive sentences are required to articulate on the record the reasons for each consecutive sentence imposed." *Norfleet*, 317 Mich App at 654; see also *People v Broden*, 428 Mich 343, 350-351; 408 NW2d 789 (1987) where our Supreme Court articulated:

> In order to aid the appellate review process in determining whether there has been an abuse of discretion, . . . the trial court must, at the time of sentencing, articulate on the record its reasons for imposing the sentence given. A silent record precludes the appellate court from determining whether the trial court considered impermissible factors or whether an ostensibly harsh or disparate sentence is justified by permissible considerations. The articulation-of-reasons requirement further acts as a safeguard against rash and arbitrary decisions by forcing the sentencing judge to focus on relevant factors, and it also reduces the risk that inaccurate information will be considered.

On appeal, defendant contends that at both sentencing and the *Ginther* hearing, the trial court steadfastly refused to explain why it had imposed consecutive sentences. When announcing its ruling at sentencing, the trial court explained:

> Well, I'm gonna exercise my discretion in favor of consecutive sentencing in this case. I think it's appropriate.

* * *

> Actually home invasion here I could—I have the discretion to sentence him to life because it's a 20 year offense and he was convicted as a habitual fourth offender, but I'm going to in the exercise of my discretion sentence the defendant to a term of years on the home invasion.

When imposing consecutive sentences, a trial court is required to articulate the reasoning for each consecutive sentence imposed. Specifically, it is required to "give particularized reasons – with reference to the specific offenses and the defendant." *Norfleet*, 317 Mich App at 666. We conclude that the trial court here spoke only generally, and did not provide the requisite particularized reasoning for its imposition of consecutive sentences. Thus, we conclude that a "[r]emand is . . . necessary so that the trial court can fully articulate its rationale for each consecutive sentence imposed." *Id*.

## IV. CONCLUSION

We affirm defendant's convictions, but remand for further sentencing proceedings consistent with this opinion. We retain jurisdiction.

/s/ Kathleen Jansen
/s/ Cynthia Diane Stephens

# Court of Appeals, State of Michigan

## ORDER

Michael J. Riordan
Presiding Judge

PEOPLE of MI v DWUAN TAMAUL PARKMAN

Docket No. 340943

Kathleen Jansen

LC No. 16-006766-01-FC

Cynthia D. Stephens
Judges

Pursuant to the opinion issued concurrently with this order, this case is REMANDED to the trial court to articulate, on the record, specific findings for the trial court's imposition of consecutive sentences pursuant to *People v Norfleet*, 317 Mich App 649, 654; 897 NW2d 195 (2016). We retain jurisdiction.

Proceedings on remand in this matter shall commence within 56 days of the Clerk's certification of this order, and they shall be given priority on remand until they are concluded. The proceedings on remand are limited to this issue.

The parties shall promptly file with this Court a copy of all papers filed on remand. Within seven days after entry, appellant shall file with this Court copies of all orders entered on remand.

The transcript of all proceedings on remand shall be prepared and filed within 21 days after completion of the proceedings.

/s/ Michael J. Riordan

Riordan, P.J., dissents as the trial court adequately explained its rationale for imposing consecutive sentences.

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

June 4, 2020
Date

Chief Clerk